## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

JACKIE HUGHES and ANGELA
HAWKINS, individually and as Next
Friends of D.H., S.H., Sk.H., and I.H.,
minor children; VALERIE MICHELLE
EVANS, Financial Guardian for the
Estate of D.H, S.H, Sk.H, and L.H.,
minor children,

TAMMY SEARCY, individually and as
Parent and Next of Friend of DARS,
DJA, BLS, and MWDS, minor children,

TAMMY ALLEN, individually and as
next of kin of LOLA RAELYNN-
NICOLE CAPLAN, and DANIELLE
DANIEL, individually and as the
Personal Representative of the Estate of
LOLA RAELYNN-NICOLE CAPLAN,
deceased,

and

BLAKE LIGHT,
         PLAINTIFFS,

VS.

STATE OF OKLAHOMA ex rel. THE
DEPARTMENT OF HUMAN
SERVICES,

      and

JUSTIN BROWN, individually and in
his capacity as Director of THE
DEPARTMENT OF HUMAN
SERVICES,

      and

Case No. CIV-21-1094-F

)

**ED LAKE, individually and in his Capacity as former Director of THE DEPARTMENT OF HUMAN SERVICES,**  )  )  )  )  )

)

**and**  )

)

**DR. DEBORAH SHROPSHIRE, individually and in her capacity as Director of the Child Welfare Services Division of THE DEPARTMENT OF HUMAN SERVICES,**  )  )  )  )  )  )

)

**and**  )

)

**JAMI LEDOUX, individually and in her capacity as former Director of the Child Welfare Division of THE DEPARTMENT OF HUMAN SERVICES,**  )  )  )  )  )  )

)

**and**  )

)

**TANYA MOSIER, individually and in her capacity as District Director of THE DEPARTMENT OF HUMAN SERVICES,**  )  )  )  )  )

)

**and**  )

)

**EUGENE GISSANDANER, individually and in his capacity as Field Analyst of THE DEPARTMENT OF HUMAN SERVICES,**  )  )  )  )

)

**and**  )

)

**SHEREE POWELL, individually and in her capacity as Director of Communications and Community Relations of THE DEPARTMENT OF HUMAN SERVICES,**  )  )  )  )  )

)
)
**and** )
)
**CALVIN KELLY, individually and in** )
**his capacity as Region Three Deputy** )
**Director of THE DEPARTMENT OF** )
**HUMAN SERVICES,** )
)
**and** )
)
**JAMIE MAJORS, individually and in** )
**her capacity as Foster Care and** )
**Adoption Program Field Administrator** )
**of THE DEPARTMENT OF HUMAN** )
**SERVICES,** )
)
**and** )
)
**MALLORY POPLIN, individual and in** )
**her capacity as Child Protective Services** )
**Supervisor of THE DEPARTMENT OF** )
**HUMAN SERVICES,** )
)
**and** )
)
**AMY WHITSON, individually and in** )
**her capacity as Region One Deputy** )
**Director of THE DEPARTMENT OF** )
**HUMAN SERVICES,** )
)
**and** )
)
**DAVID CLIFTON, individually and in** )
**his capacity as Region Five Deputy** )
**Director of THE DEPARTMENT OF** )
**HUMAN SERVICES,** )
)
**and** )
)
**ANN PARKHURST, individually and in** )
**her capacity as Supervisor for THE** )
)

3

**DEPARTMENT OF HUMAN SERVICES,**

**and**

**TRICIA HOWELL, individually and in her capacity as Deputy Director of Foster Care and Adoptions of the DEPARTMENT OF HUMAN SERVICES,**

**and**

**JOHN AND/OR JANE DOES 1-11, individually and in their capacity as Employees of THE DEPARTMENT OF HUMAN SERVICES,**

**DEFENDANTS.**

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

## SECOND AMENDED COMPLAINT

COME NOW Plaintiffs JACKIE HUGHES ("Hughes") and ANGELA HAWKINS ("Hawkins"), as the parents and next of friends of minor children D.H., S.H., Sk.H., and I.H., VALERIE MICHELLE EVANS ("Evans"), as Financial Guardian for the Estate of minor children D.H., S.H, Sk.H, and L.H., TAMMY SEARCY ("Searcy"), as the parent and next of friend of minor children DARS, DJA, BLS, and MWDS, TAMMY ALLEN, individually and as the next of kin of Lola Raelynn-Nicole Caplan, ("Allen") DANIELLE DANIEL ("Daniel"), as the personal representative of the estate of Lola Raelynn-Nicole Caplan, deceased, and BLAKE LIGHT (collectively, "Plaintiffs") and for their Second Amended Complaint ("Complaint") against the OKLAHOMA DEPARTMENT OF HUMAN SERVICES ("DHS") and its officers and employees, JUSTIN BROWN ("Brown"), ED LAKE ("Lake"), DEBORAH SHROPSHIRE ("Shropshire"), JAMI

4

LEDOUX ("Ledoux"), TANYA MOSIER ("Mosier"), EUGENE GISSANDER ("Gissander"), SHEREE POWELL ("Powell"), CALVIN KELLY ("Kelly")[1], JAMIE MAJORS ("Majors"), MALORY POPLIN ("Poplin"), AMY WHITSON ("Whitson"), DAVID CLIFTON ("Clifton"), ANN PARKHURST ("Parkhurst"), TRICIA HOWELL ("Howell"), and JOHN and/or JANE DOES 1-11, individually and in their official capacities (collectively, "Defendants"), and allege and state as follows:

## **INTRODUCTION**

The Supreme Court of the United States recently told the State of Oklahoma, "[u]nlawful acts, performed long enough and with sufficient vigor, are never enough to amend the law. To hold otherwise would be to elevate the most brazen and longstanding injustices over the law, both rewarding wrong and failing those in the right." *McGirt v. Oklahoma*, No. 18-9526, 2020 WL 3848063, at *21 (U.S. July 9, 2020). This case involves the repeated and ongoing failures of DHS that have continued for years. The state has been repeatedly told that it is acting unlawfully in regard to the protection of children in its care and has neglected (and affirmatively chosen and refused) to take the action it has been ordered to undertake. Oklahoma has promised to change, but those promises, like the promises made to the tribes in *McGirt*, have gone unfulfilled and with dire consequences.

DHS is charged with protecting the children of Oklahoma when their home environments may be or are deemed unsafe. DHS investigates reports of abuse, neglect, sexual abuse, and sexual exploitation, and takes children in to custody, placing them in

---

[1] On information and belief, Calvin Kelly has been terminated by DHS as of the filing of this Complaint.

shelters, foster care, or other living arrangements. This case is about DHS's utter neglect in protecting minor children in its custody and as to those whom it has assumed a duty to investigate because of a referral, with whom DHS has a special relationship. Despite being on actual notice of systemic failures within DHS, including that it violates its own policies and procedures, which endangers children, and specific actual or constructive notice that the children involved in this case were in danger, DHS and the individual Defendants failed to follow its own policies or procedures and otherwise take action to protect the minor children involved in this case. This neglect has resulted in catastrophic injury, trauma, and in one case, even death.[2]

Plaintiffs make the following allegations upon personal knowledge as to Plaintiffs' own acts, and upon information and belief and Plaintiffs' attorneys' investigation as to all other matters, alleging as follows:

## JURISDICTION AND VENUE

1.     This action arises under the Constitution, laws, or treaties of the United States, and and/or seeks to redress the deprivation of a right, privilege, or immunity secured by the Constitution of the United States. *See* 28 U.S.C. § 1331 (2020); 28 U.S.C. § 1343(3) (2020). This Court has supplemental jurisdiction over the State law claims, which are so

---

[2] Plaintiffs would clearly advise the court and the Defendants that the claims in this action are based on the express policies of DHS which are set out in the statutory and administrative code and the specific policies adopted by DHS and not on the Pinnacle Plan Settlement Agreement itself. The origin of the policies as originating after or from the settlement of prior litigation or the creation of Pinnacle Plan are no more relevant than if the policies were taken from another state, the federal government, or social science research. DHS policies, procedures, and standards are DHS policies, procedures, and standards, regardless of their provenance. It is DHS's choice to violate them that provides the basis of this action and for all claims.

related to the federal claims in the action that they form part of the same case or controversy under Article III of the United State Constitution.  *See* 28 U.S.C. § 1367(a).

2.      Venue is proper pursuant to 28 U.S.C. § 1391(b) in that the Defendants reside in this judicial district and the acts underlying this action occurred in this judicial district.

## THE PARTIES

A.  Plaintiffs

      i.   *Hughes, Hawkins, Evans, and Minor Children D.H., S.H., Sk.H., and I.H.*

3.      Plaintiff Hughes is a citizen of the State of Oklahoma and a resident of this judicial district.  He is the father of minor children D.H., S.H., Sk.H., and I.H.

4.      Plaintiff Hawkins is a citizen of the State of Oklahoma and a resident of this judicial district.  She is the mother of D.H., S.H., Sk.H., and I.H.

5.      D.H., S.H., Sk.H., and I.H. are members of or are eligible for membership in the federally recognized Cheyenne Arapaho Tribe.   They are, therefore, entitled to protections under the Indian Child Welfare Act, 25 U.S.C. § 1902, *et seq*. ("ICWA"), and its regulations, including, the Bureau of Indian Affairs ("BIA") Guidelines for Implementing the Indian Child Welfare Act. 25 C.F.R. § 23 ("BIA Guidelines").

6.      At times relevant to this Complaint D.H., S.H., Sk.H., and I.H were minor children in DHS custody.

7.      Plaintiff Evans is a citizen of the State of Oklahoma and a resident of this judicial district.  She is the duly appointed Financial Guardian for the Estate of minor children, D.H., S.H, Sk.H, and L.H.  She was appointed Financial Guardian through a guardianship action in tribal court.

ii.  *Searcy and DARS, DJA, BLS, and MWDS*

8.      Plaintiff Searcy is a citizen of the State of Oklahoma and a resident of this judicial district.  She is the mother and custodial parent of minor children DARS, DJA, BLS, and MWDS.

9.      At all times relevant to this Complaint, DARS, DJA, BLS, and MWDS were minor children in DHS custody.

iii.  *Allen, Daniel and Lola Caplan*

10.      Plaintiff Daniel is a citizen of the State of Oklahoma and a resident of Oklahoma County.  She is the duly appointed Personal Representative of the Estate of Lola.

11.      Plaintiff Tammy Allen is a citizen of the State of Oklahoma and a resident of Oklahoma County.  She is the maternal grandmother of Lola and next of kin.

12.      At the time of her death, Lola was a minor child and citizen of the State of Oklahoma.  At all times relevant to this Complaint, she was a minor in the custody of her biological mother who was subject to DHS referral and was, accordingly, being investigated for allegations of child abuse and neglect and/or failure to protect from child abuse and neglect.

13.      At the time of her death, Allen had made multiple reports to DHS regarding the abuse and neglect of Lola.

iv.  *Blake Light*

14.      Plaintiff Light is a citizen of the State of Oklahoma and a resident of Cleveland County.  At all times relevant to this Complaint, he was a minor child in DHS custody in Tulsa County.  He has since reached the age of majority.

B.  Defendants

      i.  *DHS*

15.    The Oklahoma Department of Human Services (DHS) is the state agency designated to administer Title IV-B and Title IV-E programs, the Child Abuse and Prevention and Treatment Act (CAPTA), and the Chafee Foster Care Independence Program. DHS was established by the state legislature in 1936 and is an umbrella agency. Since 2013, DHS has operated under the direction of the Director of DHS.

16.    Child Welfare Services (CWS) is the DHS division responsible for administering the state's child welfare services, and its purpose is to improve the safety, permanence and well-being of children and families involved in the Child Welfare system through collaboration with the families and their community. CWS operates under the direction of the State's CWS Director.

17.    As stated by the CWS, its purpose is to improve the safety, permanence, and well-being of children and families involved in the Child Welfare system through collaboration with families and their community.

18.    Programs of the Child Welfare Services Division include adoption services, child protectives services, criminal history background checks, family centered services, fingerprinting, foster care, independent living, Oklahoma children's services, permanency planning, and social security benefits for children in custody.

19.    Child Protective Services (CPS) are provided through DHS to identify, treat, and prevent child abuse and neglect. The two purposes of CPS intervention are to protect

the safety of children and to provide services to help families with any difficulties that cause the safety of their children to be at risk.

20.    DHS creates a special relationship with children it brings into custody and as to whom referrals have been made to DHS.

21.    DHS has adopted a set of policies, practices, and standards that serve to establish the basis of the work done by the DHS employees.

22.    The rules promulgated by the former Commission along with the Rules promulgated by the current and former directors are included in the Oklahoma Administrative Code (OAC) Chapter 75, Child Welfare. The CWS Division provides policy, supports child welfare in the filed by providing professional advice regarding policy and implementation, provides continuous quality improvement for child welfare and manages the systems used for child welfare services.

23.    In 2018, DHS released its FY 2019-2020 Strategy Map and in it DHS makes huge promises to both its clients and its workers that it will meet its vision by being "stronger" through stronger accountability, practices, workforce, and families.[3]

24.    DHS promised that its workforce will be informed, supported, and engaged by:

- Recruiting and training a skilled workforce;

---

[3] *See* SFY 2019-2020 Strategic Plan, Executive Summary, available at https://oklahoma.gov/content/dam/ok/en/okdhs/documents/okdhs-pdf-library/sfy2019-2020dhsstrategicplanexecutivesummary_11092018.pdf (last accessed Jan. 31, 2022).

- o DHS will recruit and retain a skilled workforce by setting up new employees for immediate success, providing more opportunities for staff engagement, and enhancing institutional knowledge;

- Providing staff a positive, collaborative, and supported work experience;
  - o DHS will improve employee satisfaction through better supports for staff, strengthening communication practices, and better preparing for change initiatives to allow for adequate staff buy-in and understanding; and

- Improving the personal and professional success of their workforce;
  - o DHS will improve the success of our staff by enhancing their skills and knowledge, encouraging professional development, and providing tools to increase work efficiency.

25.     Oklahoma Statutes, Titles, 10, 10A, and 43, and the OAC, apply to children and marriages in Oklahoma and the rights and custody of parents.

26.     Oklahoma Statutes, Title 10A, and the OAC, imposes mandatory duties on DHS and the individual Defendants, including assessment and investigation requirements, including by the appropriate personnel and within the required timeframe, per DHS priority guidelines.  *See* OAC 340:75-3-200.

ii.     _The Individual Defendants_

27.     Brown has been the Director of DHS since on or around June 2019.

28.     Lake is the former Director of DHS and was in that role from in or around 2012, until in or around June 2019, when Brown succeeded him.

11

29.     On information and belief, the role of Director of DHS includes and has included responsibility for running the Department and implementing and enforcing policy, including with respect to employee caseloads, foster care, child safety, and quality assurance.

30.     Shropshire has been the Director of the Child Welfare Services Division of DHS since in or around June 2019.

31.     Ledoux is the former Interim Director and former Director of the Child Welfare Division of DHS.  She was Interim Director from in or around August 2014 until in or around August 2015 and was Director from in or around August 2015 until in or around May 2018. On May 16, 2018, Ledoux announced her resignation as Director, citing the stress of her job and the pressures of implementing DHS policies.  Ledoux was rehired as the Chief of Innovation for DHS on July 22, 2019.

32.     On information and belief, the Director of the Child Welfare Division (including Interim Director) is and was responsible for running the Division and implementing and enforcing policies and procedures, including with respect to employee caseloads, foster care, child safety, and quality assurance.

33.     Powell is the Director of Communications and Community Relations at DHS. Powell oversees the Offices of Communications, Community and Faith Engagement, and Information and Referral.

34.     The Office of Communications and Community Relations conveys the DHS mission and informs the public, media, and other groups about programs, services, and accomplishments of the Agency.

35.     The Office of Information and Referral supports the Director of Human Services by handling calls and emails from clients, foster parents, contract providers, legislators, and other external customers.

36.     On information and belief, Powell's role includes responsibility for interpreting and explaining DHS policies, including with respect to employee caseloads, foster care, child safety, and quality assurance, to the public and external customers.

37.     Kelly was the Region Three Deputy Director of DHS and was responsible for supervising the caseworkers assigned to cases in that Region, including those of D.H., S.H., Sk.H, I.H, and Lola Caplan.

38.     Whitson was the Region One Deputy Director of DHS, which includes Canadian County, and was responsible for supervising the caseworkers within the Region, including those of DARS, DJA, BLS and MWDS.

39.     Clifton was the Region Five Deputy Director of DHS and was responsible for supervising caseworkers assigned to cases in that Region, including that of Blake Light.

40.     On information and belief, the job of Deputy Directors is to direct and coordinate all of the services provided by the Child Welfare Services Division and the associated agency operations including but not limited to Child Protective Services, Family Centered Services, and Permanency Planning Services., within their assigned Region. Deputy Directors are tasked with implementing program plans and policies, including with respect to employee caseloads, foster care, child safety, and quality assurance. Deputy Directors also ensure compliance with the State and Agency's missions, goals, priorities, vision, and values through collaboration with all levels of management from the top to

bottom of the agency and work as a liaison between the Regions and the Director of the Child Welfare Services Division and the Director of DHS.

41.     Parkhurst was an employee of DHS and worked as a Supervisor in its office in Canadian County, Oklahoma.  Parkhurst supervised case workers assigned to the cases of DARS, DJA, BLS, and MWDS.

42.     Howell is the current Assistant Child Welfare Director for Program Operations and former Deputy Director of Foster Care and Adoptions at DHS.

43.     On information and belief, the role of the Deputy Director for Foster Care and Adoptions at DHS is similar to that of a Deputy Director of a Region except that this role has a specific focus on the placement of children for permanency in foster care and adoption situations. On information and belief, this includes responsibility for making and enforcing DHS policies, including with respect to employee caseloads, foster care, child safety, and quality assurance.

44.     During the time period relevant to this Complaint, Howell was responsible for supervising Majors.

45.     Majors was the Foster Care and Adoption Program Field Administrator at DHS.  In this role, she reviewed and approved child placement for adoption and foster care on an ongoing basis. On information and belief, this includes responsibility for making and enforcing DHS policies, including with respect to employee caseloads, Foster Care, child safety, and quality assurance.

46.     Gissandaner is the Administrative Field Analyst for Region Three of DHS.

47.     On information and belief, Administrative Field Analysts direct and coordinate programs for the Child Welfare Services Division within their Region to comply with federal and state laws, regulations, and guidelines; implement policies, procedures, rules, and regulations for child welfare; analyze and evaluates program effectiveness through quality assurance activities; plan, supervise and coordinate staff activities; assign work; establish staff standards of performance; and select, manage, and evaluate staff.

48.     Mosier is the District Director for Region Three of DHS.

49.     On information and belief, a District Director is responsible for directing and managing all aspects of Child Protective Services, Family Centered Services, and Permanency Planning programs and activities.  The District Director directs and supervises Child Welfare Specialist IV's and other staff to ensure workforce quality, competence, service delivery, and compliance with law, policy, and procedures. On information and belief, this includes responsibility for establishing and upholding DHS policy with respect to employee caseloads, foster care, child safety, and quality assurance.

50.     Mosier is and was responsible for each of these areas as they related to cases within Region Three, including the cases of D.H., S.H., Sk.H., I.H, and Lola Caplan.

51.     Poplin was a Child Welfare Supervisor or CWS IV for DHS in Canadian County.

52.     On information and belief, a Child Welfare Supervisor or a CWS IV is tasked with providing direct supervision to one CWS III and four CWS I-II.  Supervisors train, direct, coordinate, evaluate, and prioritize the work of those under their supervision. Supervisors manage tracking systems created to monitor work assignment, turnover, staff

experience and case evaluation.  On information and belief, it is the job of the Supervisor to assure compliance with Federal and State Law and agency policy and to hold monthly meetings with staff to discuss individual cases, training, and development.

53.     Poplin supervised caseworkers assigned to the cases of DARS, DJA, BLS and MWDS.

54.     Defendants John and/or Jane Does 1-5 are or were employees of DHS in the Oklahoma County, Oklahoma office, in Region Three, and/or any other Regions who were involved with the cases of D.H., S.H., Sk.H, I.H, and/or Lola Caplan and whose identities are not known at this time.[4]

55.     Defendants John and/or Jane Does 6-8 are or were employees of DHS in the Canadian County, Oklahoma office, in Region 1, and/or any other Regions who were involved with the cases of DARS, DJA, BLS, and MWDS and whose identities are not known at this time.

56.     Defendants John and/or Jane Does 9-11 are or were employees of DHS in the Tulsa County, Oklahoma office, in Region 5, and/or any other Regions who were involved with the case of Blake Light and whose identities are not known at this time.

57.     On information and belief, each and every individual Defendant had, as part of their job with DHS, the responsibility and obligation to ensure that DHS acted in good faith compliance with DHS policies and procedures and State and Federal law in the care, investigation, and placement of children of Oklahoma who are reported to be the victims

---

[4] On information and belief, John and/or Jane Does 1-5 include, but are not limited to, a case worker named Marginique (LNU), who was assigned to investigate the referral to DHS of Lola Caplan, and Melissa (LNU), who supervised Marginique as to that investigation.

of abuse or neglect. Each Defendant had an obligation as an individual and as a professional to report and investigate abuse and neglect, and to ensure that children were placed in safe environments within the confines of the law and DHS policy.

58.     Both DHS and each and every individual Defendant had mandatory duties to comply with Oklahoma Statute, the Oklahoma Administrative Code, and other policies, procedures, and standards of DHS.

59.     At all times relevant to this Complaint, the Individual Defendants were acting under color of state law.

C.  Plaintiffs' Compliance With the Oklahoma Governmental Tort Claims Act

i.  *Plaintiffs Hughes, Hawkins, and Evans, and minor children D.H., S.H., Sk.H, and I.H.*

60.     Hughes, Hawkins, and Danielle Daniel[5] sent Defendant DHS notice of their tort claim pursuant to 51 O.S. § 151, *et seq.* on June 21, 2019, and received confirmation of the same on June 25, 2019.

61.     DHS did not accept or deny liability for the tort claim.

62.     Ninety (90) days passed and the tort claim was deemed denied on September 21, 2019.

63.     Plaintiffs Hughes, Hawkins, and Danielle Daniel timely filed their original Petition, which was later dismissed.

64.     The initial Petition was filed on June 24, 2019.

65.     The matter was dismissed without prejudice on January 29, 2019.

---

[5] Danielle Daniel was previously the duly appointed guardian ad litem for minor child D.H.  She is no longer guardian ad litem for D.H.  Evans was later appointed Financial Guardian for D.H., S.H. Sk.H, and I.H.

66.     No statute of limitations has run on the minor children's claims.

67.     All other claims were timely refiled pursuant to 12 O.S. §100.

ii.     *Plaintiff Searcy and minor children DARS, DJA, BLS, and MWDS*

68.     Searcy sent Defendant DHS notice of her tort claim pursuant to 51 O.S. § 151, *et seq*. on December 11, 2019, and received confirmation of the same on December 16, 2019.

69.     Searcy filed suit in the District Court of Oklahoma County on December 11, 2019.

70.     Searcy timely filed an Amended Petition on September 4, 2020, asserting causes of Action under the Oklahoma Tort Claims Act.

71.     Searcy filed her original Petition, which was later dismissed on January 29, 2021.

72.     No statute of limitations has run on the minor children's claims.

73.     All other claims were timely refiled pursuant to 12 O.S. §100.

iii.     *Plaintiffs Allen, Daniel and Lola Caplan*

74.     Tammy Lynn Allen[6] sent Defendant DHS notice of her tort claim pursuant to 51 O.S. § 151, et seq. on May 31, 2019, and received confirmation of the same on June 7, 2019

75.     DHS did not accept or deny liability for the tort claim.

---

[6] Tammy Lynn Allen is the grandmother and next of kin of Lola.  She was previously the Personal Representative of Lola.  Danielle Daniel has since been appointed Personal Representative of the Estate of Lola Caplan.

76.    Ninety (90) days passed and the tort claim was deemed denied on August 29, 2019.

77.    Suit was initiated within 180 days of the denial of the claim

78.    Tammy Allen filed her original Petition, which was later dismissed on January 29, 2021.

79.    The First Amended Petition in this matter was filed within the statutory time period to refile and was, therefore, timely filed, before removal to this Court.

iv.    *Plaintiff Light*

80.    Light sent Defendant DHS notice of his tort claim pursuant to 51 O.S. § 151, et seq. on August 18, 2020, and received confirmation of the same on August 21, 2020.

81.    Pursuant to a letter from OMES, the 90 days to accept or deny the claim began to run on September 7, 2020.

82.    DHS did not accept or deny liability for the tort claim.

83.    Ninety (90) days passed and the tort claim was deemed denied.

84.    Light timely filed his original petition in State Court before removal to this Court.

## STATEMENT OF FACTS

A.  Plaintiffs Hughes, Hawkins, Evans, and Minor Children D.H., S.H., Sk.H., and I.H.

   i.    *DHS Ignores Department-Wide Abuses and Specific Allegations that D.H., S.H., Sk.H., and I.H are Being Abused in their Foster Placement*

85.    At all times relevant to this Complaint, Defendants Kelly, Gissandaner, Mosier, and John and/or Jane Does 1-5 were responsible for oversight and supervision of

the children within Oklahoma County and/or Region Three, including D.H., S.H., Sk.H., and I.H.

86.     At all times relevant to this Complaint, each Defendant had actual or constructive knowledge of complaints by DHS employees that DHS was not complying with its policies and the law, particularly in terms of case management and safety, both throughout the State and within Region Three.

87.     Defendants also each had actual and constructive knowledge of the neglect and failures of foster homes, shelters, and care providers throughout the State and within Region Three to adequately and appropriately protect children.

88.     DHS's neglecting to comply with its policies and the law include, but are not limited to, neglecting to fulfill its mandatory duties imposed by law and DHS policies and standards.

89.     Hughes and Hawkins are the biological parents of D.H., S.H., Sk.H., and I.H.

90.     D.H., S.H., Sk.H., and I.H were in DHS custody at all times relevant to the Complaint.  Thus, DHS had a special relationship with D.H., S.H., Sk.H, and I.H.  They were transferred out of DHS custody and into the custody of the Cheyenne Arapaho Tribe, because of the abuse they suffered while in DHS custody.

91.     DHS vetted, investigated, and approved Justine Kersey as a foster parent, then appointed her as foster parent of the D.H., S.H., Sk.H., and I.H.

92.     Plaintiffs do not challenge the placement of  D.H., S.H., Sk.H., and I.H. with Kersey for foster case; nor do they challenge DHS's licensing or approval of Kersey as a

foster parent.  Rather, they challenge DHS's actions and inactions while on notice that D.H., S.H., Sk.H., and I.H. were in danger while in Kersey's case.

93.     While under the care of Kersey, and prior to June 22, 2018, D.H., S.H., Sk.H., and I.H sustained myriad injuries, including, but not limited to, a dislocated elbow, a forehead injury requiring medical intervention, and multiple instances of bruising and abrasions.

94.     Prior to June 22, 2018, Hughes and Hawkins repeatedly requested that DHS remove D.H., S.H., Sk.H., and I.H from Kersey's care because they were not safe and cared for there.

95.     Prior to June 22, 2018, Cheyenne Arapaho Indian Child Welfare Workers, on behalf of Hughes and Hawkins and their tribe, also requested of DHS, the removal of D.H., S.H., Sk.H., and I.H from Kersey's care, because of the injuries sustained by the children and suspected ongoing abuse.

96.     D.H., S.H., Sk.H., and I.H were not in a foster placement that complied with the ICWA, since tribal members and the tribe itself had been complaining to DHS about the placement, specifically as to the injuries and abuse that D.H., S.H., Sk.H., and I.H experienced while placed with Kersey.

97.     Prior to June 22, 2018, Kersey further refused Cheyenne Arapaho Indian Child Welfare Workers access to D.H., S.H., Sk.H., and I.H in her home when they appeared for unannounced visits to check on the welfare of the minor children.  On information and belief, DHS was on actual or constructive notice of this refusal.

98.     Despite, prior to June 22, 2018, being put on actual notice by Hughes, Hawkins, and the Cheyenne Arapaho Tribe, that D.H., S.H., Sk.H., and I.H were being abused and sustaining injuries, and being on actual and constructive notice of failures within the DHS system that put children at risk, DHS chose and refused to perform its mandatory duties, including but not limited to, adequately investigating, and denied Hughes's, Hawkins's, and the Tribe's requests that the children be removed from Kersey's care.

        ii.   _D.H Sustains Serious Burns While She and Five Other Young Children Were Left Overnight With Kersey's Teenage Nephew, Leading to a Doctor Describing the Child as Having Been "Cooked"_

99.     In June 2018, despite multiple uninvestigated complaints of injuries and abuse, D.H., S.H., Sk.H., and I.H were still in a foster placement with Kersey, under authority of DHS.

100.    On June 22, 2018, Kersey left her home at or around 7:00 p.m. for an evening at the casino with her boyfriend.

101.    Kersey left six children— D.H., S.H., Sk.H., and I.H, and two others—all of whom were under the age of six, in the care of her 15-year-old nephew.  The youngest child left there was only eleven months old.  D.H. was only three years old at the time.

102.    Five out of the six children who Kersey left alone with her nephew have special needs, requiring extra care and supervision.

103.    Kersey did not return home until at or around mid-morning the following day, _i.e._, eighteen to twenty hours later.

104.   On information and belief, Kersey did not check on the children at all during the time that she was gone.

105.   In the early hours of June 23, 2018, D.H. sustained severe and debilitating third, fourth, and fifth degree burns to twenty-five percent of her body, including her face, head, neck, and shoulders.

106.   The burn injuries were so severe that D.H.'s physician(s) described her skin and cartilage as "cooking" or having been "cooked."

107.   D.H. did not receive any medical care until approximately thirteen hours after she sustained her injuries.

108.   When medical care was eventually sought, D.H.'s injuries were so severe that the toddler had to be placed in a medically-induced coma.

109.   D.H.'s head, face, nose, ears, lips and eyelids were severely disfigured because of these injuries, which have required her to undergo extensive medical treatment, including several invasive surgical procedures.

110.   D.H. will require substantial medical care in the future, including several invasive surgical reconstructions of her facial features.

111.   Even with multiple surgeries, D.H. will have substantial and permanent deformity to her head, face, neck, and shoulders for the rest of her life.

112.   S.H., Sk.H., and I.H., aside from suffering abuse at the hands of Kersey while in DHS care—and while DHS was on actual and constructive notice of its failures to follow the law and its own policies, procedures, and standards, both in general and specifically as

to S.H., Sk.H., I.H, and D.H.—were forced to be present and witness the severe injuries suffered by D.H.

B. Plaintiff Searcy and Minor Children DARS, DJA, BLS, and MWDS

    i. *Plaintiff Searcy and DARS, DJA, BLS, and MWDS suffered severe and ongoing domestic violence at the hands of the children's biological father*

113.    Kevin Searcy is the former spouse of Plaintiff Searcy and is the biological father of Searcy's four minor children, DARS, DJA, BLS, and MWDS.  Kevin Searcy is not a party to this action.

114.    Searcy and DARS, DJA, BLS and MWDS are survivors of domestic violence perpetrated by Kevin Searcy, who has a demonstrated history of domestic abuse going back to at least 2001.

115.    On or around June 26, 2014, Searcy obtained an Emergency Protective Order against Kevin Searcy on behalf of herself and DARS, DJA, BLS and MWDS in the District Court of Cleveland County, Case No. PO-2014-324.  She was granted a Permanent Victim's Protective Order—effective for a term of five years—later that same year

116.    Despite the permeant order, Kevin Searcy continued to threaten, stalk, and harass Searcy and DARS, DJA, BLS and MWDS.

117.    One method of harassment utilized by Kevin Searcy was to cause unfounded calls to be made to DHS and law enforcement alleging that Searcy was harming and neglecting DARS, DJA, BLS and MWDS.

118.   Kevin Searcy contacted law enforcement and DHS authorities to request welfare checks and allege abuse and neglect by Searcy in Payne, Cleveland, Canadian, Oklahoma, Caddo, and Logan Counties.

119.   Kevin Searcy also filed a baseless Petition for Protective Order against Searcy in Cleveland County, Case No. PO-2015-541, in order to harass her.

120.   Kevin Searcy has been criminally prosecuted for domestic abuse in Cleveland County, Case No. CF-2013-1077, and Canadian County, Case No. CM-2012-314.

121.   From 2014 forward, Searcy and DARS, DJA, BLS and MWDS were continuously on the run from Kevin Searcy and in fear for their safety due to pervasive harassment and violence and the neglect by law enforcement and DHS to intervene and stop the harassment.

122.   On August 12, 2019, the Court entered a Final Protective Order on behalf of Searcy and DARS, DJA, BLS and MWDS and against Kevin Searcy.  The Order is to remain effective until modified or vacated by the Court.

      ii.   *DHS becomes involved with the Searcy children*

123.   BLS is a profoundly disabled child who is on the autism spectrum with Autism Spectrum Disorder (ASD), has Lennox Gastaut Syndrome, and Dravet.  She has pervasive seizure disorder and suffers multiple seizures per day and is non-verbal.

124.   These conditions cause her to be unable to care for herself in ways that a child of her age would typically be able to.

125.    Despite her disabilities and her inability to verbally communicate, BLS is not physically limited in her ability to do things like open doors, walk, run, and ride a bike, and is known to be a "runner" child who escapes from her home.  Because of her disabilities, she does not understand or appreciate danger or dangerous situations.

126.    On or about December 11, 2017, BLS, unbeknownst to Searcy, left the home where Searcy and DARS, DJA, BLS, and MWDS were temporarily residing because they had been forced to flee Kevin Searcy's violence.

127.    BLS escaped from her home in the early morning hours while the family members were sleeping and was walking down the street not fully dressed.

128.    The family had taken all ordinary precautions used to prevent her from leaving the home, but unbeknownst to the family BLS managed to unlock the door and leave.

129.    A neighbor observed BLS walking and contacted the Mustang Police alleging that BLS was in danger.

130.    When Searcy woke up, she found that BLS was gone and immediately contacted the Police when she could not locate her, and discovered that BLS was in the care of Mustang PD.

131.    Mustang PD contacted DHS alleging that BLS was a deprived child.

132.    Because of the history of domestic violence between Tammy Searcy and the children's biological father, DHS had a history on this family. Further the biological father had a history of making false reports of neglect against Tammy Searcy as a means of exercising power and control over her to attempt to force her to return to his home.

133.    Tammy Searcy was on the run from Kevin Searcy the biological father who had previously threatened to kill her and her children and had a Victim's Protective Order against him, in an attempt to protect herself and her children from his abuse.

134.    Due to the ongoing harassment and false allegations made by Kevin Searcy, DHS perceived Searcy to be on the run from DHS rather than trying to hide from her abuser Kevin Searcy and to protect her children.

135.    Based upon previous allegations made by Kevin Searcy and without a full investigation to determine the nature and extent of the alleged past events, DHS took the minor children into custody.

136.    The Searcy children were taken into custody under the investigation and direction of Tamara and Jason, Canadian County DHS workers.

137.    Ann Parkhurst was the DHS Supervisor on the Searcy case and Parkhurst actively sought to prevent the children from being returned to Searcy.

138.    At the time the children were taken into custody, Searcy was not advised where the children were being taken or with whom they were placed.

139.    BLS was placed in multiple shelters that were not equipped to handle and care for her severe and profound disabilities, which caused her to be exposed to and endure significant mental, physical, and emotional abuse including the unapproved removal of her teeth and attempts at forced vaccination over Searcy's objection, despite DHS being aware that BLS is a vaccine injured child.

140.    DARS, DJA, BLS, and MWDS were in the care, custody, and control of DHS from December 11, 2017, until March 15, 2019, when they were released from the custody

of DHS and returned to the custody of Searcy via an exit order, *see* Case No. JD-2017-103 (Canadian County).

141.   BLS was allowed to return to her Searcy's home in October 2018 for trial reunification, but she remained in DHS custody.

142.   On or about December 11, 2018, DARS, DJA, and MWDS returned to the custody and care of Searcy.

143.   On or about March 15, 2019, DHS closed the case against Tammy Searcy on the allegations of abuse and neglect.

144.   While DARS, DJA, BLS, and MWDS were in the care, custody, and control of DHS, they feared disclosing to their mother the full nature and extent of the neglect and abuse they were experiencing.

145.   Due to the ongoing court case and statements made by DHS workers, contractors, and the Court, Searcy feared making any official report or claim on behalf of herself and DARS, DJA, BLS, and MWDS.

146.   During the ongoing litigation, Searcy was repeatedly denied the opportunity to speak and present evidence on her own behalf.

147.   The Honorable Judge Bob Hughey was the original assigned Judge to Searcy's case and heard the case while Searcy was represented by Randy Baumgartner. During one court hearing when Searcy was represented by Baumgartner, Searcy interjected that her Constitutional rights were being violated and was advised by Judge Hughey that she had no rights under the Constitution in that courtroom and that the Judge made the decisions which impacted her and her children.

148.   In September of 2018, Searcy obtained new counsel which caused the removal of Judge Hughey due to a conflict.  Only after the removal of Judge Hughey, who is the ordinary Judge in Canadian County for DHS cases, did Searcy's case begin to move forward in any positive manner.

149.   While in the custody of DHS, BLS was placed at the JD McCarty Center for Children with Developmental Disabilities.  During one court hearing, a representative of JD McCarty falsely testified that Searcy was not compliant with the plan of treatment and care for BLS.  The JD McCarty Center's employee received the support and backing of DHS Supervisor of Ann Parkhurst who also maintained that Searcy was not a safe proper parent.

150.   However, DHS worker Vanessa DeLeon who worked closely with Tammy Searcy and her children testified that the JD McCarty worker lied about the facts and circumstances of the incident.  Shortly thereafter BLS, the most vulnerable of the Searcy children was returned to the care custody and control of Searcy in October of 2018.

151.   However, despite returning BLS in October of 2018 and determining that the Searcy home was safe for the most vulnerable child, DHS refused to return DARS, DJS, and MWDS to the care of Searcy until December 2018.

152.   The Searcy family then continued to be under the supervision of DHS until March 2019.

153.   In December 2019, a member of school staff made a referral to DHS alleging concerns for BLS's hygiene.

154.    The Searcy children were immediately picked up by DHS and taken into its physical custody.

155.    Searcy's counsel thereafter made immediate demand for the children.  DHS agreed to return the children to Searcy, and the investigation was closed.

156.    After the children were returned to Searcy, DHS chose and refused to transfer the accumulated social security benefits for BLS back to Tammy Searcy.  As of the date of the filing of this Complaint, DHS continues to hold the balance of the social security benefits which accumulated and were unspent for BLS during the time in which she was in custody.

157.    The acts committed by DHS were a continuous and ongoing series of events designed to obscure and hide the true nature of the conduct of DHS workers and interfere with the ability of Searcy to determine the violation of her rights and those of DARS, DJA, BLS, and MWDS.

158.    DARS, DJA, BLS, and MWDS were placed in multiple homes and moved from location to location without DHS properly advising Searcy of their locations and well-being.

159.    DARS, DJA, BLS, and MWDS were all subjected to physical, emotional and/or sexual abuse because of DHS's and the individual Defendants'—particularly those that operated with supervisory authority in Canadian County, including but not limited to Defendants Whitson, Poplin, Parkhurst, and John and/or Jane Does 6-8—neglecting and refusing to investigate, vet, and train foster workers, and implement and follow DHS's own policies and procedures.

160.    At all times relevant to this Complaint, Defendants Whitson, Poplin, Parkhurst, and John and/or Jane Does 6-8 were responsible for oversight and supervision of children within Canadian County, including the minor children.

161.    At all times relevant to this Complaint, each Defendant had knowledge of complaints by DHS employees that DHS was not complying with its policies and the law, particularly in terms of case management and safety.

162.    Defendants collectively received multiple complaints about the treatment of the Searcy children while in custody. However, despite evidence of abuse and neglect, the minor children remained in DHS custody and Searcy was deprived of her children.

163.    Defendants each had actual and constructive knowledge of the failures of the foster homes, shelters, and care providers to adequately and appropriately protect children and families like the Searcy family.

164.    The DHS worker individual Defendants each actively refused and failed to investigate the claims as they were brought to the agency's attention by Searcy and/or her family.

165.    From December 11, 2017, through December 11, 2018, the Searcy children were continuously subjected to abuse and neglect while they were in the care, custody, and control of the foster care system.  The DHS workers to whom the abuse and neglect was reported chose and refused to take reasonable and appropriate action to investigate the allegations and refused and failed to protect the children or provide adequate and safe living conditions.

166.    DHS by and through its employees, particularly those that operated with supervisory authority in Canadian County, including but not limited to Defendants Whitson, Poplin, and John and/or Jane Does 6-8, along with all individual Defendants, have deprived the minor children and Searcy of their constitutionally protected rights to be a family and to be free and safe from abuse and neglect.

C.  Plaintiffs Allen, Daniel and Deceased Minor Child Lola Caplan

167.    Lola was born on February 19, 2015, to Jacob and Alexis Caplan. Sometime after Lola's birth, her parents separated and Lola's father, Jacob Caplan, left the State of Oklahoma, leaving Lola in the custody and care of Alexis Caplan.

168.    Alexis Caplan became romantically involved with Bailee Sowards and the couple, along with Lola, combined their residences. Lola was left in the care of Bailee Sowards while Alexis worked.

169.    Sometime after Alexis, Lola, and Bailee moved in together, Tammy Allen, Lola's maternal grandmother, noticed Lola having unexplained burns and bruising on her body.

170.    Around that time, Bailee was using illegal steroids, which caused him to be angry and violent.

171.    Tammy Allen and others made several referrals to DHS with concerns that Lola was being subjected to abuse and/ or neglect.

172.    At all times relevant to this Complaint, Defendants Kelly, Gissandaner, Mosier, and John and/or Jane Does 1-5 were responsible for oversight and supervision of the children within Oklahoma County where the minor children were located.

173.   At all times relevant to this Complaint, each Defendant had knowledge of complaints by DHS employees that DHS was not complying with its policies and the law, particularly in terms of case management and safety.

174.   The nature and extent of the injuries suffered by Lola Caplan were categorized as Pl or Priority 1 injuries under DHS's standards, requiring DHS to act immediately to ascertain the risk associated to the child.  This is a mandatory, not a discretionary, function of DHS.

175.   Pursuant to DHS policy and procedure a CSW1 should not respond to allegations involving a Pl claim.  This is a mandatory, not a discretionary, function of DHS.

176.   One or more of the referrals was accepted by DHS and an inexperienced worker (one of the John or Jane Doe Defendants) was assigned to the investigation. Assigning this inexperienced case worker violated DHS's own policies, procedures, or standards.

177.   In conjunction with the investigation, Tammy Allen sent the assigned worker photographs of the bruises she had seen and documented on Lola's body.

178.   DHS by and through its workers, particularly Defendants Kelly, Gissandaner, Mosier, and John and/or Jane Does 1-5, refused and failed to open a second investigation when Tammy Allen called in a second referral, reporting injuries to Lola's face and trunk.

179.   Although DHS had information confirming Lola was at risk of irreparable harm, DHS took no precautionary steps to ensure the safety and wellbeing of Lola,

including but not limited to, creating a safety plan and/ or removing Lola from the abusive and neglectful environment.

180.    DHS created a special relationship with Lola when it opened an investigation but failed to adequately conduct that investigation according to the law and its own mandatory policies, procedures, and standards.

181.    Defendants refused and failed to reasonably and appropriately investigate Lola's injuries or to ascertain that she was in imminent danger, despite being on actual or constructive notice of such danger and failed to use its professional judgment to stop such danger.

182.    On May 31, 2018, while the referrals/investigations remained open or pending, Lola went into cardiac arrest and was transported to OC Children's Medical Center in Oklahoma City. Upon arrival, Lola was unresponsive, pale and cold, and not breathing. The medical staff attempted resuscitation for approximately 35 minutes, but all attempts were unsuccessful, and Lola was pronounced deceased at approximately 7:16 a.m.

183.    During the examination and resuscitation attempts, medical personnel discovered that Lola had bruising on the back of her head, forehead, both ears, chest, abdomen, bilateral upper and lower extremities, back, and buttocks, all of which were consistent with non-accidental trauma.

184.    Lola's body was transported to the medical examiner's office for further examination. The medical examiner's report lists Lola's death as homicide and indicates at the time of death that Lola had approximately 100 cutaneous contusions of various ages on her head, chest, abdomen, back, buttocks, upper extremities, and lower extremities.

34

185.   The medical examiner's report indicates the significant observations and documents Lola's injuries as "multiple cutaneous ecchymoses of head, torso, and extremities; Hemoperitoneum; Liver Laceration; and Hemorrhage of Small Bowel Mesentery."

186.   Alexis Caplan and Baylee Sowards, Alexis's girlfriend, were charged with child neglect and child abuse in the death of Lola Caplan in the District Court of Oklahoma County.

187.   Alexi Caplan and Baylee Sowards were convicted of child neglect and child abuse in the death of Lola Caplan.

188.   Sowards was sentenced to two life terms in the Department of Corrections.

189.   Alexis Caplan was sentenced to life with the first twenty years of her sentence to do in the custody of the Department of Corrections.

D.  Plaintiff Blake Light

190.   Light is a young man who was taken into DHS custody when he entered the foster care system in or around 2004, when he was approximately two (2) years old.

191.   Light was returned to the care of his biological mother at DHS's direction within the next few years at which point he was sold into slavery and forced to perform manual labor, sleep in a cage, and endure physical and sexual abuse. This went on for years before DHS eventually intervened again and took Light into custody sometime around 2010, placing him in a foster-to-adopt placement.

192.   Plaintiff Light does not challenge his being taken into DHS custody, or his placement in a foster-to-adopt placement.   Rather, he challenges DHS's failures to

intervene once he was in placement and while DHS was on actual or constructive notice that he was in imminent danger.

193.    Light's foster parents, who were hand-selected by DHS, abandoned the child with DHS within six (6) months of his placement into their home. DHS again hand-selected another foster-to-adopt placement for Light in 2013. He was adopted without his consent and forced to take his foster parents' last name. Light did not wish to be adopted by his foster parents in 2013 and, in fact, had disclosed instances of abuse by his foster parents to DHS workers. While in the home of these foster, then adoptive, parents, Light endured four (4) years of physical, emotional, and sexual abuse. During these years, Light's mental health declined to such a state that he attempted suicide more than half a dozen times.

194.    From February 15 through April 22 of 2017, Light was admitted to Parkside Hospital, a behavioral health facility wherein he again disclosed the extent of the abuse he was suffering in his adoptive home.  Parkside was required to and, on information and belief, did report these abuse allegations to DHS.  However, DHS did nothing to remedy the situation, instead allowing the abuse to continue.

195.    On April 22, 2017, against his wishes and despite his disclosure of abuse, Light was taken back into the custody of his adoptive parents.

196.    In June of 2017, Light was again abandoned at a DHS office by his adoptive parents and again taken into DHS custody.

197.    For the next approximately six (6) months, Light was shuffled from shelter to shelter while DHS refused and failed to provide him with a suitable placement.

198.    In January 2018, Light was placed with the Williams family who eventually adopted him with his consent.

199.    As a result of the extreme abuse he has endured, Light suffers from depression, reliving past memories, non-epileptic seizures, and severe post-traumatic stress disorder.

200.    In May 2019, Light was admitted to another behavioral health facility for profound depression and risk of suicide. Light presently continues to struggle with post-traumatic stress disorder and other ramifications of the abuse and neglect he endured during his childhood, which include significant disruption to his relationships and opportunities.

201.    At all times relevant to this Complaint, Defendants Clifton and John and/or Jane Does 9-11 were responsible for oversight and supervision of the children within Tulsa County where Light was located.

202.    At all times relevant to this Complaint, Defendants Clifton and John and/or Jane Does 9-11, among other Defendants and DHS employees, had knowledge of complaints made by Light that he was being subjected to abuse and was in danger.

203.    At all times relevant to this Complaint, each Defendant had knowledge of complaints by DHS employees that DHS was not complying with its policies and the law, particularly in terms of case management and safety.

204.    Defendants each had actual and constructive knowledge of the failures of the foster homes, shelters, and care providers to adequately and appropriately protect children, including Light.

205.    Defendants each had actual and constructive knowledge, based on complaints from Light himself, and others including, on information and belief, medical providers, that Light was in imminent danger.

206.    Defendants each actively chose and refused to investigate the claims as they were brought to the agency's attention by Light and, on information and belief, medical providers, as well as DHS employees.

E.    Defendants Had Actual Notice of Violations That Put Children in Danger

207.    As described in each of the sections above, as to each Plaintiff, DHS and the individual Defendants had actual notice that the minor children on whose behalf Plaintiffs bring this case and Light were placed in custody situations where they suffered harm and abuse and, accordingly, were in imminent danger.

208.    Despite such actual notice, Defendants did not take appropriate steps to remedy the situation, but instead, continued to act in violation of DHS's policies, procedures, and standards, continued to act contrary to law, and continued to act in ways that unreasonable placed the minor children on whose behalf Plaintiffs bring this case and Light in harms' way.

209.    In addition to being put on actual notice as to the Plaintiffs' situations, Defendants were put on notice that violations of its policies and procedures, which would likely result in harm to children, were rampant within the Department.

210.    At all times relevant to this Complaint Ed Lake and/or Justin Brown were the duly appointed Director of DHS.

211.    During the time in which the minor children on whose behalf Plaintiffs bring this case and Light were in custody, Ed Lake and/or Justin Brown had actual and constructive knowledge of the failures of the foster homes, shelters, and care providers to adequately and appropriately protect children and families like the minor children on whose behalf these claims are brought, Light, and their families.

212.    Both prior to and after the minor children on whose behalf Plaintiffs bring this case and Light were taken into custody, multiple DHS workers advised Lake and others at DHS of the problems in the DHS system and the failure to protect children.  Lake could have, and had a responsibility to, but did not, take action to stop the abuse the children suffered.

213.    On information and belief, Ed Lake was advised by Shawna Burley, a child welfare worker, about the high burden being placed on DHS workers and the refusal and failure of the workers to be able to adequately investigate claims.

214.    Throughout 2017 and thereafter, multiple high-ranking officials at DHS, including but not limited to the individual Defendants, threatened child welfare workers with discipline for failing to close investigations.

215.    High ranking DHS officials, including but not limited to individual Defendants, pressured DHS workers to close case files without the workers performing full, adequate, and appropriate investigations.

216.    In April and May of 2017, Heidi Stingley, a DHS Supervisor in Oklahoma County informed Calvin Kelly and Eugene Gissandaner about the failures in the child

welfare system and its contributions to the child deaths and neglect of the children while under the care and custody of the system.

217.   Instead of performing the appropriate investigations, DHS suspended and ultimately terminated Stingley after she sought to protect records which documented DHS failures.

218.   In October 2017, Heidi Stingley went to the media and disclosed DHS's neglect in refusing to investigate and protect children in and out of custody.

219.   In November 2017, DHS workers Holly Goralewicz and Shawna Burley spoke to the media about DHS's failures to investigate and protect children in and out of custody.

220.   During this time DHS employee Dahn Gregg was also making complaints to high-ranking officials that DHS was not complying with the law and was placing children in unsafe homes. In or around March and May of 2018, Dahn Gregg also went to the media and made complaints about DHS failing to follow policy and procedure, and endangering children.

221.   Instead of listening to the concerns and fears of their experienced case workers and supervisors, the individual Defendants ignored the signs of neglect and failure within the foster care system and allowed the damage to the minor children on whose behalf Plaintiffs bring this case and Light to occur.

222.   Individual Defendants knew that children in the care of DHS, including the Plaintiffs, were in danger and failed to exercise professional judgment regarding such danger.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION – VIOLATION OF 42 U.S.C. § 1983
### (Against the Individual Defendants)

223.    Plaintiffs incorporate Paragraphs 1 through 222 by reference, as if fully set forth herein.

224.    42 USC §1983 provides, in relevant part, that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, subjects or causes to be subjected, any citizen of the United States…  to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proceeding for redress…."

225.    The Supreme Court of the United States has found a substantive due process interest in safe conditions, personal security, and bodily integrity for persons in state custody. *Yvonne L., By & Through Lewis v. New Mexico Dep't of Hum. Servs*., 959 F.2d 883, 891 (10th Cir. 1992), citing *City of Revere v. Massachusetts General Hosp*., 463 U.S. 239, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983).

226.    Under the minimum protections afforded by the Fourteenth Amendment of the United States Constitution—which provides, in pertinent part, as follows: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law," children have a "clearly established constitutional right to be reasonably safe from harm when placed in the state's custody." *Deal v. Brooks*, 2016 OK CIV APP 81, ¶ 37, 389 P.3d 375, 386, citing *Yvonne L. ex rel. Lewis v. N.M. Dep't of Human Servs*., 959 F.2d 883, 891 (10th Cir. 1992).

41

227.    Minors subject to DHS investigation because of a referral to DHS are also entitled to these Constitutional rights.

228.    Minors in physical and legal custody of the state and placed in a private foster care facility have a clearly established constitutional right to be reasonably safe from harm, such that if state officials placed the minors in a foster home or an institution that they knew or suspected to be dangerous to minors, they would incur liability if harm occurred. *Yvonne L., By & Through Lewis v. New Mexico Dep't of Hum. Servs*., 959 F.2d 883 (10th Cir. 1992).

229.    Plaintiffs, on behalf of the minor children on whose behalf they bring this case (or on behalf of himself in the case of Plaintiff Light), each have a clearly established constitutional right to bodily integrity and caseworker supervision, and the right to safe conditions of custody/supervision, and adequate medical care, including protection from cruel and unusual punishment.

230.    Defendants violated Plaintiffs' rights when they refused and failed to follow DHS's own policies, procedures, and standards designed to protect children such as the minor children on whose behalf Plaintiffs bring this case (or Plaintiff, in the case of Light), failed to follow the law meant to protect Plaintiffs and others like them, failed to adequately staff cases of children, including such minor children and Light, and allowed the minor children and Light to remain in an unsafe environment despite being on both actual and constructive notice that it was unsafe and that they were in imminent danger.

231.    Plaintiffs, on behalf of the minor children on whose behalf they bring this case (or on behalf of himself in the case of Plaintiff Light), each have a clearly established

constitutional right pursuant to the Fourteenth Amendment of the United States Constitution, which was violated by Defendants when they refused and failed to follow DHS's own policies and procedures designed to protect children, such as the minor children and Light.

232.    Plaintiffs, on behalf of the minor children on whose behalf they bring this case (or on behalf of himself in the case of Plaintiff Light), each have a clearly established constitutional right pursuant to the Fourteenth Amendment of the United States Constitution which was violated by Defendants when Defendants refused and neglected to take any action to protect the minor children and Light from harm, even after being on actual and constructive notice that the minor children and Light were not in a safe placement.

233.    Under the Fourteenth Amendment to the United States Constitution, the State of Oklahoma and the individual Defendants, have assumed an affirmative duty to provide reasonable care to and to protect from harm, children, including the minor children and Light, with whom they have formed a special relationship, including the foster placement relationship, and the investigatory/referral relationship.

234.    At all times relevant to this Complaint, the individual Defendants were responsible for properly investigating and processing allegations of child abuse and child neglect, including by foster parents and other family or care situations with whom DHS had placed children. Furthermore, the individual Defendants had a duty to exercise ordinary care and reasonable prudence in carrying out these functions. See 10A O.S. §1-2-101, et seq.

235.    The training, supervision, policy, implementation, and oversight of foster parents and other family or care situations like those that the minor children on whose behalf Plaintiffs bring this case and Light were placed with is a function traditionally performed by the State of Oklahoma, specifically, individual Defendants. See 10A O.S. §1-7-101 et seq.

236.    Due to the individual Defendants' choice, refusal, and failure to act and/or negligent or reckless creation of danger, Plaintiff's suffered immense and irreparable harm.

237.    At all times relative to the issues set forth herein, the individual Defendants were responsible for the oversight of foster parents and other family or care situations and had the duty to properly investigate and respond to allegations of abuse or neglect in DHS-sanctioned foster homes or other family or care situations pursuant to 10A O.S. §1-2-101 et. seq. and 10A O.S. §1-7-101 et. seq.

238.    The minor children on whose behalf Plaintiffs bring this case and Light, as children in the custody and control of DHS, or as children under investigation based on a referral to DHS, were de facto wards of the state and thereby had a special relationship with the State of Oklahoma which imposed upon the State and the individual Defendants a duty to protect and care for them. *See* 10A O.S. §1-7-101 et. seq.

239.    The acts and omissions of the individual Defendants constitute a policy, pattern, practice and/or custom that is inconsistent with the exercise of accepted professional judgment and amount to deliberate indifference to the constitutionally protected interests of the Plaintiffs.

240.    Upon information and belief, the individual Defendants knowingly and intentionally deprived Plaintiffs of their constitutional right of substantive due process as guaranteed by the Fourteenth Amendment to the United States Constitution.

241.    Certain substantive due process rights of the Plaintiffs have been violated by the individual Defendants including but not limited to:

      a.   The right to freedom from maltreatment while under the protective supervision of the State of Oklahoma;

      b.   The right to protection from unnecessary intrusions into the child's emotional well-being once the State has established a special relationship with that child;

      c.   The right to services necessary to prevent unreasonable risk of harm; and

      d.   The right to conditions and duration of foster care or other care reasonably related to the purpose of government custody.

242.    Upon information and belief, although the individual Defendants were made aware of various instances of neglect and abuse, they refused and failed to take any protective action on behalf of the minor children on whose behalf Plaintiffs bring this case and Light in violation of 10A O.S. §1-2-101 et. seq.

243.    Upon information and belief, the individual Defendants, either by way of failure and/or refusal to properly investigate reports of abuse and neglect with respect to the minor children on whose behalf Plaintiffs bring this case and Light, or by actively interfering with the detection of child abuse and neglect, abdicated their duties to Plaintiffs on behalf of the minor children and Light.

244.    Upon information and belief, the individual Defendants' reporting omissions and/or concealment placed the minor children on whose behalf Plaintiffs bring this case and Light at substantial risk of serious, immediate, and proximate harm.

245.    The individual Defendants knew or should have known that the foster or other care situation in which the minor children on whose behalf Plaintiffs bring this case and Light were placed were unsafe and unsuitable.

246.    The blatant failures and/or refusals of the individual Defendants, which resulted in severe and permanent physical and psychological injury to the minor children on whose behalf Plaintiffs bring this case and Light, when viewed in their totality, shock the conscience.

247.    As such, the individual Defendants have violated Plaintiffs' clearly established constitutional rights of substantive due process, under the Fourteenth Amendment, specifically regarding their interest in safe conditions, personal security, and bodily integrity.

248.    Because the individual Defendants have violated Plaintiffs' clearly established constitutional rights, they are not entitled to qualified immunity.

249.    When viewed in its totality, the conduct of the individual Defendants reveal that the individual Defendants were engaged in a pattern of acts and omissions that perpetuated the abuse inflicted on the minor children on whose behalf Plaintiffs bring this case and Light.

250.    The DHS-approved foster parents or other individuals with whom the minor children on whose behalf Plaintiffs bring this case and Light were placed with were acting

as agents of Defendant DHS at all times relevant to this Complaint and, therefore, DHS and the individual Defendants are responsible for the conduct of these individuals.

251.   The individual Defendants, through the abdication of their professional duties and reckless indifference for the concerns of their employees and the children in their case, created an environment which permitted DHS-approved foster parents and others with whom the minor children on whose behalf Plaintiffs bring this case and Light were placed, to cause harm to the minor children and Light in the course of their duties as state-appointed guardian.

252.   As a result of the conduct of the individual Defendants, each Plaintiff is entitled to recover judgments on behalf of the minor children on whose behalf they bring this case, and Light on behalf of himself, against each Defendant for an amount in excess of $75,000.00 together with interest, attorneys' fees and costs. Plaintiffs are further entitled to punitive and exemplary damages in an amount to be determined by the trier of fact.

253.   Each individual Defendant's conduct was at least equivalent to reckless disregard for each Plaintiff's rights for which the individual Defendants should be punished in an amount sufficient to deter similar conduct in the future.

### SECOND CAUSE OF ACTION – *MONELL* LIABILITY 42 U.S.C. § 1983 (Against Defendant DHS)

254.   Plaintiffs incorporate Paragraphs 1 through 222 by reference, as if fully set forth herein.

255.    DHS failed to adequately train its employees, including the individual Defendants, with respect to the consequences, requirements, and effect of failing to follow the law and DHS's policies, procedures, and standards.

256.    DHS also failed to adequately train its employees, including the Individual Defendants, with respect to following the law and its policies, procedures, and standards.

257.    Had DHS engaged in adequate training on these subjects, the individual Defendants would not have failed to follow the law and DHS policies, procedures, and standards, and would have perceived the dire consequences and effects of those failures, thereby avoiding the harm that was caused to the minor children on whose behalf Plaintiffs bring this case and Light.

258.    The complete lack of training on these subjects evidences a deliberate indifference on the part of DHS to the rights of Plaintiffs.

### THIRD CAUSE OF ACTION – *RESPONDEAT SUPERIOR*
### (Against Defendant DHS)

259.    Plaintiffs incorporate Paragraphs 1 through 222 by reference, as if fully set forth herein.

260.    The Supreme Court of the United States has found a substantive due process interest in safe conditions, personal security, and bodily integrity for persons in state custody. *Yvonne L., By & Through Lewis v. New Mexico Dep't of Hum. Servs*., 959 F.2d 883, 891 (10th Cir. 1992), citing *City of Revere v. Massachusetts General Hosp*., 463 U.S. 239, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983).

261.   Under the minimum protections afforded by the due process clause of the Oklahoma Constitution, which provides that "[n]o person shall be deprived of life, liberty, or property, without due process of law," Okla. Const. art. 2, 7, and by the Fourteenth Amendment of the United States Constitution—which provides, in pertinent part, as follows: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law," children have a "clearly established constitutional right to be reasonably safe from harm when placed in the state's custody." *Deal v. Brooks*, 2016 OK CIV APP 81, ¶ 37, 389 P.3d 375, 386, citing *Yvonne L. ex rel. Lewis v. N.M. Dep't of Human Servs*., 959 F.2d 883, 891 (10th Cir. 1992).

262.   Regarding 51 O.S. § 151, *et seq*., "the GTCA does not immunize DHS from liability for certain reckless and deliberate acts that deprive a child of due process rights while in state custody." *Deal v. Brooks*, 2016 OK CIV APP 81, ¶ 29, 389 P.3d 375, 384, citing *Bosh v. Cherokee County Building Authority*, 2013 OK 9, 305 P.3d 994.

263.   As described above, Defendant DHS, through its agents and employees, recklessly and knowingly placed Plaintiffs in harm's way by rendering them more vulnerable to danger.

264.   Defendant DHS, through its agents and employees, recklessly and knowingly placed Plaintiffs D.H., S.H., Sk.H., and I.H in harm's way by placing them in the care of Kersey, whom it knew, or recklessly failed to consider, was dangerous, abusive, and unfit to care for children.

265.   In placing Plaintiffs D.H., S.H., Sk.H., and I.H in the care of Kersey, DHS placed them at substantial risk of serious, immediate, and proximate harm.

49

266.    Even after Plaintiffs D.H., S.H., Sk.H., and I.H were placed in the care of Kersey, Defendant DHS, through its agents and employees, recklessly and deliberately ignored the requests of Hughes and Hawkins to remove them from Kersey's care, even though they were notified that the children were not safe.

267.    Defendant DHS's reckless and deliberate actions continued when Cheyenne Arapaho Indian Child Welfare Workers, on behalf of Hughes and Hawkins and their tribe, also requested removal of D.H., S.H., Sk.H., and I.H from Kersey's care because of the injuries sustained by the children and suspected ongoing abuse.

268.    Defendant DHS's actions leading to placing Plaintiffs D.H., S.H., Sk.H., and I.H in the care of Kersey, as well as its active disregard to the warnings that they were in immediate danger 'shocks the conscience.'

269.    As a result of DHS's actions, Plaintiffs D.H., S.H., Sk.H., and I.H sustained injuries, including, but not limited to, a dislocated elbow, a forehead injury requiring medical intervention, and multiple instances of bruising and abrasions. Further, D.H. sustained severe and debilitating third, fourth, and fifth degree burns to twenty-five percent of her body, including her face, head, neck, and shoulders. S.H., Sk.H., and I.H. were forced to be present and witness the severe injuries suffered by D.H.

270.    Defendant DHS, through its agents and employees, recklessly and knowingly placed DARS, DJA, BLS, and MWDS, minor children on whose behalf Plaintiffs bring these claims, in harm's way by removing them from custody of their mother, Searcy.

271.    Further, Defendant DHS, through its agents and employees, recklessly and knowingly placed DARS, DJA, BLS, and MWDS in harm's way by refusing to investigate,

vet, and train foster workers and failing to implement and follow DHS's own policies and procedures.

272.    Defendant DHS, through its agents and employees—particularly those that operated with supervisory authority in Canadian County, including but not limited to Defendants Whitson, Poplin, Parkhurst, and John and/or Jane Does 6-8—actively ignored and dismissed multiple complaints about the treatment of the Searcy children while in custody. However, despite evidence of abuse and neglect, the minor children remained in DHS custody.

273.    Defendant DHS's actions removing DARS, DJA, BLS, and MWDS from the custody of their mother recklessly and knowingly placed Plaintiffs in harm's way by rendering them more vulnerable to danger.

274.    Further, Defendant DHS's active refusal to take appropriate measures to protect DARS, DJA, BLS, and MWDS recklessly and knowingly placed Plaintiffs in harm's way by rendering them more vulnerable to danger.

275.    Defendant DHS, through its deliberate choices to remove the Searcy children from their mother's custody and to blatantly ignore multiple complaints of abuse and neglect, placed them at substantial risk of serious, immediate, and proximate harm.

276.    Defendant DHS's actions leading to removing DARS, DJA, BLS, and MWDS from the custody of Searcy, as well as its active disregard to the multiple complaints and warnings that they were in immediate danger 'shocks the conscience.'

277.    As a result of DHS's actions, Plaintiffs DARS, DJA, BLS, and MWDS were all subjected to physical, emotional and/or sexual abuse.

278.    Defendant DHS, through its agents and employees, recklessly and knowingly placed Lola in harm's way by neglecting to take precautionary steps to ensure her safety and wellbeing, including but not limited to, creating a safety plan and/or removing Lola from the abusive and neglectful environment.

279.    Defendant DHS refused and failed to reasonably and appropriately investigate Lola's injuries or to ascertain that she was in imminent danger, despite being on actual or constructive notice of such danger and failed to use its professional judgment to stop such danger.

280.    As a result of DHS's actions and/or neglect, Lola suffered immense physical injuries, went into cardiac arrest, and ultimately died.

281.    Defendant DHS, through its agents and employees, recklessly and knowingly placed Plaintiff Blake Light in harm's way by actively choosing and refusing to investigate the claims as they were brought to the agency's attention by Light and, on information and belief, medical providers, as well as DHS employees.

282.    As a result of DHS's actions and/or neglect, Blake Light suffered continued injuries, including, but not limited to being forced into slavery, being forced to sleep in a cage, physical and sexual abuse, and severe emotional and psychological distress.

283.    As a result of DHS's actions and/or neglect, Blake Light was returned to his abusive adoptive home, after he himself reported abuse and attempted suicide.

## FOURTH CAUSE OF ACTION – NEGLIGENCE
### (Against all Defendants)

52

284.     Plaintiffs incorporate Paragraphs 1 through 222 by reference, as if fully set forth herein.

285.     At all times relative to this Complaint, Defendants were responsible for properly investigating allegations of abuse and neglect with respect to the minor children on whose behalf Plaintiffs bring this case and Light and had a duty to exercise ordinary and reasonable care in doing so under 10A O.S. §1-2-101, *et seq*.

286.     This cause of action does not challenge the placement of the minor children on whose behalf Plaintiffs bring this case and Light in foster care or other custody situations, nor does it challenge the licensing or approval of any foster parent or facility where the minor children on whose behalf this case is brought and Light were placed. Rather, it challenges DHS's and the individual Defendants' refusal and failure to investigate, remove the children, or take further appropriate action (including performing their mandatory duties under the law and DHS policies, procedures, and standards), after being put on actual and/or constructive notice that the children were being abused or were unsafe, or that their placements were otherwise inappropriate.

287.     Defendants had a duty and obligation as the legal custodian of (or because it investigated the referrals of) the minor children on whose behalf Plaintiffs bring this case and Light to ensure their proper physical care and safety.

288.     Defendants breached that duty by refusing and/or failing to open investigations or properly investigate allegations that minor children on whose behalf Plaintiffs bring this case and Light were being abused or were unsafe and refusing to remove them from unsafe and/or inappropriate situations.

289.   Defendants were notified of the danger that the minor children on whose behalf Plaintiffs bring this case and Light were in, but refused and/or failed to take appropriate actions to ensure their safety.

290.   This refusal and/or failure constitutes willful and wanton negligence and/or recklessness, which places the individual Defendants outside the scope of their employment.

291.   "Although employees of the state are protected from tort liability while performing within the scope of their employment, such protection does not render such employees immune from liability for willful and wanton negligence or other conduct which places the employees outside the scope of their employment." *Cooper v. Millwood Indep. Sch. Dist. No. 37*, 1994 OK CIV APP 114, ¶ 16, 887 P.2d 1370.

292.   Like in *Benshoof v. Niles*, 2016 OK CIV APP 57, ¶¶ 22-23, 380 P.3d 902, 907, where, in a libel action, the state-employee defendants were held to have acted outside of the scope of their employment when the plaintiff's petition asserted "that Defendants continued to provide his photo with incorrect arrest information for repeated publication by OK Jailbirds despite Plaintiff's repeated requests to desist," here, the individual Defendants were notified of the dangers that Plaintiffs faced, but refused to act. As the court found in *Benshoof*, the conduct of the individual Defendants places them outside the scope of their employment and, thus, outside of the immunity that 51 O.S. § 163(C) grants.

293.   As a result of the negligent conduct of Defendants, the minor children on whose behalf Plaintiffs bring this case and Light suffered severe physical and/or psychological injuries and pain and suffering.

294.     As a result of the negligent conduct and breach of duty of the Defendants, the minor children on whose behalf Plaintiffs bring this case and Light have suffered and will continue to suffer lost quality of life.

295.     As a result of the negligent conduct and breach of duty of the Defendants, Plaintiffs Searcy, Hughes, and Hawkins have also suffered and will continue to suffer mental anguish and suffering.

296.     As a result of the negligent conduct and breach of duty of the Defendants, Plaintiffs have incurred medical bills and/or other monetary damages on behalf of the minor children on whose behalf Plaintiffs bring this case (or on behalf of himself in the case of Light).

297.     As a result of the negligent conduct and breach of duty of the Defendants, Plaintiffs have incurred damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) and are further entitled to punitive and exemplary damages in an amount to be determined by the trier of fact.

## FIFTH CAUSE OF ACTION – NEGLIGENCE PER SE
### (Against all Defendants)

298.     Plaintiffs incorporate Paragraphs 1 through 222 by reference, as if fully set forth herein.

299.     In addition to the duty to exercise ordinary care there are also duties imposed upon Defendants by statutes, rules, and policies. Defendants violated any and all of the following statutes, rules and policies, and these violations were the direct cause of the

injuries to the Plaintiffs: Oklahoma Constitution Art 25, §1 et seq, 21 OS §546, and OAC 340:1-1-1 et seq.

300.    This cause of action does not challenge the placement of the minor children on whose behalf Plaintiffs bring this case and Light in custody situations, nor does it challenge the licensing or approval of any foster parent or facility where the minor children on whose this case is brought and Light were placed.  Rather, it challenges DHS's failure to investigate, remove them, or take further appropriate action (including performing their mandatory duties under the law and DHS policies, procedures, and standards), after being put on actual and/or constructive notice that they were being abused or were unsafe.

301.    As a result of the actions of Defendants, the Plaintiffs have suffered damages in excess of $75,000.00 as a proximate result of Defendants' negligence per se and the Plaintiffs are entitled to punitive and exemplary damages in an amount to be determined by the trier of fact.

## SIXTH CAUSE OF ACTION – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against all Defendants)

302.    Plaintiffs incorporate Paragraphs 1 through 222 by reference, as if fully set forth herein.

303.    Defendants, either singularly on in concert, acted intentionally and/or recklessly in causing physical and mental harm and injury to Plaintiffs through the minor children on whose behalf Plaintiffs bring this case and to Light.

304.    This cause of action does not challenge the placement of the minor children on whose behalf Plaintiffs bring this case and Light in custody situations, nor does it

challenge the licensing or approval of any foster parent or facility where the minor children on whose this case is brought and Light were placed. Rather, it challenges DHS's neglecting to investigate, remove them, or take further appropriate action (including performing their mandatory duties under the law and DHS policies, procedures, and standards), after being put on actual and/or constructive notice that they were being abused or were unsafe.

305.    The conduct of Defendants was extreme, outrageous, and would shock the conscious of any reasonable person.

306.    As a result of Defendants' conduct, each of the Plaintiffs suffered severe and prolonged emotional distress, as did the minor children on whose behalf Plaintiffs bring this case.

307.    As a result of the intentional emotional distress cause to Plaintiffs and the minor children on whose behalf Plaintiffs bring this case, Plaintiffs have each incurred damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) and are further entitled to punitive and exemplary damages in an amount to be determined by the trier of fact.

### SEVENTH CAUSE OF ACTION – CONSPIRACY
#### (Against individual Defendants)

308.    Plaintiffs incorporate Paragraphs 1 through 222 by reference, as if fully set forth herein.

309.    Each of the individual Defendants engaged in a civil conspiracy which operated to deprive Plaintiffs of certain rights and liberties.

310.    The individual Defendants intentionally conspired together to deprive the minor children on whose behalf Plaintiffs bring this case and Light of their safety, of access to medical care, of a suitable and safe living environment, and to a life free from abuse.

311.    Each of the individual Defendants conspired to commit these unlawful acts by and through their choice and refusal to properly investigate allegations of abuse and neglect with respect to each Plaintiff (as described in this Complaint) and to protect and/or remove the children from an unfit and dangerous environment even after being on actual and/or constructive notice that the children were in unsafe and inappropriate living situations.

312.    The civil conspiracy engaged in by the Defendants was the actual and proximate cause of the Plaintiffs' damages.

313.    Each Plaintiff is entitled to recover judgments against each Defendant for an amount in excess of $75,000.00 together with interest, attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants as follows:

a.    Declaring that Defendants violated the law and/or DHS policy, procedure, or standards, and enjoining them from further violations.

b.    Entering an injunction requiring Defendants to comply with the terms of the law and all relevant DHS policies, procedure, or standards.

c.      Awarding Plaintiffs damages, including compensatory damages, punitive damages, exemplary damages, damages for garden variety emotional distress, and all other available damages, in an amount to be determined at trial.

d.      Awarding Plaintiffs their reasonable attorneys' fees and expenses;

e.      Awarding pre- and post-judgment interest on any amounts awarded; and

f.      Awarding such other and further relief as may be just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all causes of action so triable.

## CONCLUSION

WHEREFORE, Plaintiffs respectfully request that the Court grant judgment in their favor and against each of the Defendants and award them the damages, including punitive and exemplary damages, attorney's fees, costs and expenses, pre-judgment interest at the statutory rate, and any and all other relief to which they are entitled by law and which this Court deems just and equitable.

Dated:  January 31, 2022                    Respectfully submitted,

Rachel Bussett, OBA#19769
Ashley Weyland, OBA#32141
**BUSSETT LEGAL GROUP, PLLC**
2201 N. Classen Blvd.
Oklahoma City, Oklahoma 73106
Telephone: (405) 605-8073
Fax: (405) 212-9112
Rachel@BussettLegal.com
Ashley@BussettLegal.com

59

Christopher D. Stombaugh*
**DiCELLO LEVITT GUTZLER LLC**
Post Office Box 437
Platteville, Wisconsin  53818
Telephone: (440) 953-8888
cstombaugh@dicellolevitt.com

Laura E. Reasons*
**DiCELLO LEVITT GUTZLER LLC**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois  60602
Telephone: (312) 214-7900
lreasons@dicellolevitt.com

*Counsel for Plaintiffs*

**\*** *Pro Hac Vice Admission Anticipated*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing was filed using the Court's CM/ECF electronic filing system on March 18, 2022, which will cause a notice of such filing to all counsel of record.

<u>/s/ *Rachel Bussett*        </u>