## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

JACKIE HUGHES and ANGELA )
HAWKINS, individually and as Next )
Friends of D.H., S.H., Sk.H., and I.H., )
minor children, et al., )
)
        Plaintiffs, )
)
-vs- )     Case No. CIV-21-1094-F
)
STATE OF OKLAHOMA, ex rel. )    (District Court of Oklahoma County,
THE DEPARTMENT OF HUMAN )    Case No. CJ-2021-1949)
SERVICES, et al., )
)
        Defendants. )

## <u>ORDER</u>

This action was originally commenced in the District Court of Oklahoma County, Oklahoma.  Defendants, State of Oklahoma, ex rel. the Department of Human Services (DHS), and 14 current and former DHS officers and employees, removed the action to this court, invoking subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(3) (deprivation of civil rights under color of state law).  With leave of court, plaintiffs filed a Second Amended Complaint (complaint).  Doc. no. 21.  The complaint alleges claims against DHS, current and former employees (in their individual and official capacities), and John "and/or" Jane Does (Does) 1-11, under 42 U.S.C. § 1983 (violation of Fourteenth Amendment substantive due process rights) and under Oklahoma law (violation of Oklahoma constitution, negligence, negligence *per se*, intentional infliction of emotional distress and civil conspiracy).  In response to the complaint, DHS and the 14 current and former DHS employees filed motions seeking to dismiss all claims pursuant to Rule 12(b)(6), Fed. R. Civ. P.  Doc. nos. 25 and 26.  Plaintiffs have

responded, opposing dismissal.  Doc. nos. 27 and 28.  Defendants have replied.  Doc. nos. 29 and 30.  The motions are fully briefed and ripe for determination.[1]

I.

*Standard of Review*

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quotation marks and citation omitted).  In reviewing a motion to dismiss, the court accepts "all well-pleaded factual allegations" as true and views them "in the light most favorable to the nonmoving party."  Brown v. Montoya, 662 F.3d 1152, 1162 (10th Cir. 2011) (quotation marks and citation omitted).

"The nature and specificity of the allegations required to state a plausible claim will vary based on context."  Kansas Penn Gaming, LLC v. Collins, 656 F.3d 1210, 1215 (10th Cir. 2011) (citation omitted).  In a § 1983 action against individual government actors, it is "particularly important" that "the complaint make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state."  *Id*. (quotation marks and citation omitted) (emphasis in original).

As part of their motion, the 14 current and former DHS employees in their individual capacities raise the defense of qualified immunity as to the § 1983 claims.  To overcome qualified immunity, plaintiffs carry the burden of demonstrating that

---

[1] After completion of briefing, plaintiffs filed a motion requesting oral argument as to defendants' motions.  Doc. no. 31.  Defendants did not respond in opposition.  Upon review, the court finds oral argument is not necessary.  Plaintiffs' motion is denied.

the factual allegations made in the complaint establish a violation of the Fourteenth Amendment right to substantive due process and that the right was clearly established at the time of the alleged misconduct. *See*, Pearson v. Callahan, 555 U.S. 223, 232 (2009). Plaintiffs "'must allege facts sufficient to show (assuming they are true) that the defendants plausibly violated [their] constitutional rights, and that those rights were clearly established at the time.'" Dahn v. Amedei, 867 F.3d 1178, 1185 (10th Cir. 2017) (quoting Robbins v. Oklahoma, 519 F.3d 1242, 1249 (10th Cir. 2008)).

II.

*Factual Allegations from the Second Amended Complaint*

a.   Plaintiffs Jackie Hughes, Angela Hawkins and Valerie Mitchell Evans, and D.H., S.H., Sk.H. and I.H.

Jackie Hughes and Angela Hawkins are the biological father and mother (the parents) of minor children, D.H., S.H., Sk.H. and I.H. The minor children are members of or are eligible for membership in the federally recognized Cheyenne Arapaho Tribe. Valerie Mitchell Evans is the duly appointed financial guardian for the estate of the minor children. She was appointed financial guardian for the estate of the minor children through a guardianship action in tribal court.

At all relevant times, the minor children were in DHS custody. Defendants Calvin Kelly (Kelly), Eugene Gissandaner (Gissandaner), Tanya Mosier (Mosier), and Does 1-5 were responsible for oversight and supervision of children within Oklahoma County and DHS's Region Three.

Kelly was Deputy Director for Region Three and was responsible for supervising the caseworkers assigned to cases in Region Three.

Gissandaner was the Administrator Field Analyst for Region Three. In that position, he was responsible for (1) directing and coordinating programs for the Child Welfare Services Division to comply with federal and state laws, regulations,

3

and guidelines; (2) implementing policies, procedures, rules and regulations for child welfare; (3) analyzing and evaluating program effectiveness through quality assurance activities; (4) planning, supervising and coordinating staff activities; (5) assigning work; (6) establishing staff standards of performance; and (6) selecting, managing, and evaluating staff.

Mosier was District Director for Region Three.  In that position, she was responsible for (1) directing and managing all aspects of Child Protective Services, Family Centered Services, and Permanency Planning programs and activities; and (2) directing and supervising Child Welfare Specialist IV's and other staff to ensure workforce quality, competence, service delivery, and compliance with law, policy, and procedures.  Mosier was also responsible for establishing and upholding DHS policy with respect to employee caseloads, foster care, child safety, and quality assurance.

Does 1-5 were DHS employees involved in the cases of D.H., S.H., Sk.H. and I.H.

DHS appointed Justine Kersey (Kersey) as a foster parent of the minor children.  While under Kersey's care and prior to June 22, 2018, the minor children sustained a myriad of injuries, including, but not limited to, a dislocated elbow, a forehead injury requiring medical intervention, and multiple instances of bruising and abrasions.

Prior to June 22, 2018, the parents repeatedly requested DHS to remove the minor children from Kersey's care.  The Cheyenne Arapaho Indian Child Welfare Workers, on behalf of the parents and the tribe, also requested DHS to remove the minor children from Kersey's care because of the injuries sustained by the children and suspected ongoing abuse.

Prior to June 22, 2018, Kersey refused Cheyenne Arapaho Indian Child Welfare Workers access to the minor children when they appeared for unannounced

visits to check on the welfare of the minor children.  DHS was on actual or constructive notice of the refusal.

Prior to June 22, 2018, DHS did not adequately investigate the children's situation and denied the parents' and tribe's requests that the children be removed from Kersey's care.

On June 22, 2018, Kersey left her home at or around 7:00 p.m. for an evening with her boyfriend at a casino.  She left six children, including the minor children, all under the age of six, in the care of her 15-year-old nephew.  Five of the children had special needs, requiring extra care and supervision.  Kersey did not check on the children while she was gone.

In the early morning hours of June 23, 2018, D.H., who was three years old, sustained severe and debilitating third, fourth, and fifth degree burns on 25% of her body, including her face, head, neck, and shoulders.  Kersey did not return home until at or around mid-morning on June 23, 2018.  D.H. did not receive any medical care until approximately 13 hours after she sustained her injuries, and her injuries were so severe she had to be placed in a medically induced coma.  D.H. had to undergo extensive medical treatment, including several invasive surgical procedures, and will require substantial medical care in the future, including several invasive surgical reconstructions of her facial features.  D.H. will have substantial and permanent deformity to her head, face, neck, and shoulders for the rest of her life.  S.H., Sk.H. and I.H. were present and witnessed the severe injuries suffered by D.H.

The minor children were transferred from DHS custody to the custody of the Cheyenne Arapaho Tribe.

b.    Plaintiff Tammy Searcy and DARS, DJA, BLS and MWDS

Tammy Searcy (Searcy) is the biological mother and custodial parent of minor children DARS, DJA, BLS and MWDS.  Kevin Searcy, a non-party, is Searcy's

former spouse and the minor children's biological father.  Searcy and her minor children are survivors of domestic abuse perpetrated by Kevin Searcy, who was criminally prosecuted for his conduct.

On or around June 26, 2014, Searcy obtained an emergency protective order against Kevin Searcy (father), on behalf of herself and the minor children.  Later in the year, Searcy was granted a permanent victim's protective order.

Despite the permanent order, the father continued to threaten, stalk, and harass Searcy and the minor children.  One method of harassment by the father included unfounded calls to DHS authorities and law enforcement in Payne, Cleveland, Canadian, Oklahoma, Caddo, and Logan counties, alleging Searcy was harming and neglecting the minor children.  The father also filed a baseless petition for protective order in 2015 against Searcy.

On August 12, 2019, a final protective order was entered against the father.

At all times relevant, BLS was a disabled child who was on the autism spectrum with Autism Spectrum Disorder, had Lennox-Gastaut Syndrome and Dravet Syndrome.  She had a pervasive seizure disorder, suffered multiple seizures per day, and was nonverbal.  Because of her disabilities, BLS did not understand or appreciate danger or dangerous situations.  She was known to be a "runner" child, a child who escapes from her home.

On or about December 11, 2017, BLS, unbeknownst to Searcy, managed to unlock a door and leave the home where Searcy and the minor children were temporarily residing while on the run from the father.  BLS escaped in the early morning hours while the family was sleeping.  A neighbor observed BLS and contacted the Mustang Police Department alleging BLS was in danger.

When Searcy awoke and discovered BLS missing, she contacted Mustang Police Department and discovered BLS was in its care.  The department contacted DHS alleging BLS was a deprived child.  Because of the father's previous false

reports to DHS, the agency perceived Searcy to be on the run from it rather than trying to hide from the father to protect herself and the minor children. Based on the father's previous allegations and without a full investigation into the nature and extent of the alleged past events, DHS took the minor children into custody. The minor children were taken under the investigation and direction of two Canadian County DHS workers, Tamara and Jason (last names unknown). Searcy was not advised as to where or with whom the minor children were placed. Ann Parkhurst (Parkhurst) was supervisor on the Searcy case, and she actively sought to prevent the children from being returned to Searcy.

BLS was placed in multiple shelters that were not equipped to handle her disabilities, which caused her to be exposed to and endure significant mental, physical, and emotional abuse, including the unapproved removal of her teeth and attempts at forced vaccination, despite DHS being aware she was a vaccine-injured child.

One of the shelters in which BLS was placed was the JD McCarty Center for Children with Developmental Disabilities. During a court hearing, a representative of the center falsely testified that Searcy was not compliant with the plan of treatment and care for BLS. The representative received the support and backing of Parkhurst, who also maintained that Searcy was not a safe parent. Another DHS worker, Vanessa DeLeon, who worked closely with Searcy and her minor children, testified that the representative had lied about the facts and circumstances of the escape incident.

In October of 2018, shortly after the court hearing, BLS was returned to Searcy. Despite determining that Searcy's home was safe for BLS, DHS refused to return DARS, DJA and MWDS to Searcy until December 2018. The minor children remained under DHS's supervision until March 15, 2019, when the case against Searcy on allegations of abuse and neglect was closed.

In December 2019, a school staff member made a referral to DHS alleging concerns for BLS's hygiene. The minor children were picked up by DHS and taken into physical custody. Searcy's counsel made an immediate demand for the children, and DHS agreed to return the minor children to Searcy. DHS refused to transfer accumulated social security benefits for BLS back to Searcy.

During their custody, DARS, DJA and MWDS were also placed in multiple homes. Searcy was not properly advised as to the location and well-being of any of her minor children. The minor children were subjected to physical, emotional, and sexual abuse. The DHS workers to whom the abuse and neglect were reported chose and refused to take reasonable and appropriate action to investigate the allegations.

Defendants Amy Whitson (Whitson), Mallory Poplin (Poplin), Parkhurst, and Does 6-8 were responsible for oversight and supervision of children within Canadian County and DHS's Region One, which included Searcy's minor children.

Whitson was Deputy Director for Region One and was responsible for supervising case workers within Region One, including the case workers for DARS, DJA, BLS and MWDS. Poplin was a child welfare supervisor in Canadian County and supervised caseworkers assigned to the cases of DARS, DJA, BLS and MWDS. Parkhurst worked as a supervisor in DHS's Canadian County office and supervised case workers assigned to DARS, DJA, BLS and MWDS. Does 6-8 were DHS employees who were involved in the cases of DARS, DJA, BLS and MWDS.

c.   Plaintiffs Tammy Lynn Allen and Danielle Daniel, and Lola Raelynn-Nicole Caplan

Tammy Lynn Allen (Allen) is the maternal grandmother and next of kin of Lola Raelynn-Nicole Caplan (Caplan), deceased. Danielle Daniel is the duly appointed personal representative of Caplan's estate.

Caplan was born on February 19, 2015. Sometime after her birth, Caplan's parents separated and she was left in the custody of her biological mother, Alexis

Caplan. The mother became romantically involved with Baylee Sowards (Sowards) and the couple moved in together. The mother left Caplan in the care of Sowards while she worked.

Allen noticed unexplained burns and bruising on Caplan's body. Around that time, Sowards was using illegal steroids, which caused her to be angry and violent. Allen and others made several referrals to DHS with concerns that Caplan was being subjected to abuse and neglect.

Defendants Kelly, Gissandaner, Mosier and Does 1-5 were responsible for the oversight and supervision of children in Oklahoma County, where Caplan resided.

One or more of the referrals were accepted by DHS. An inexperienced case worker, a Doe defendant, was assigned to the investigation in violation of DHS's policies, procedures and standards. Allen sent the case worker photographs of the bruises she had seen and documented on Caplan's body.

Allen called in with a second referral reporting injuries to Caplan's face and trunk. Defendants Kelly, Gissandaner, Mosier, and Does 1-5 failed to open a second investigation.

DHS took no precautionary steps to ensure the safety and well-being of Caplan, including, but not limited to, creating a safety plan and removing Caplan from the abusive and neglectful environment.

On May 31, 2018, while the referral/investigation remained open or pending, Caplan went into cardiac arrest and was transported to Oklahoma City Children's Medical Center. After medical personnel attempted resuscitation for approximately 35 minutes, Caplan was pronounced dead. Medical personnel discovered bruising on the back of Caplan's head, forehead, both ears, chest, abdomen, upper and lower extremities, back, and buttocks.

The medical examiner listed Caplan's death as a homicide and indicated Caplan had approximately 100 cutaneous contusions of various ages on her head, chest, abdomen, back, buttocks, and upper and lower extremities.

Caplan's mother and Sowards were charged with and convicted of child abuse crimes.  Sowards received two life sentences, and Caplan's mother received a life sentence with the first twenty years of her sentence in the custody of the Oklahoma Department of Corrections.

d.    Plaintiff Blake Light

Plaintiff Blake Light (Light), who has reached the age of majority, entered DHS's foster care system in 2004.  He was then approximately two years old.  Within the next few years, DHS returned Light to his biological mother.  He was sold into slavery and was forced to perform manual labor, sleep in a cage, and endure physical and sexual abuse.  DHS again took Light into custody sometime around 2010, placing him in a foster-to-adopt placement.

Light's foster parents, selected by DHS, abandoned him within six months. DHS selected new foster parents for Light in 2013, and they adopted him without his consent.  He was forced to take their name.  Light had disclosed to DHS workers instances of abuse by the foster parents.  While in the home of the foster, then adoptive, parents, Light endured four years of physical, emotional, and sexual abuse. He attempted suicide more than half a dozen times.

From February 15 through April 22, 2017, Light was admitted to Parkside Hospital, a behavioral health facility, where he disclosed the extent of abuse he was suffering in his adoptive home.  The hospital reported the abuse allegations to DHS. DHS did nothing to remedy the situation.  Light was returned to the custody of his adoptive parents.

In June of 2017, Light was abandoned at a DHS office by his adoptive parents and taken into DHS custody.  For the next six months, he was shuffled from shelter to shelter while DHS refused and failed to provide him with suitable placement.

In January 2018, Light was placed with the Williams family who eventually adopted him with his consent.

As a result of the extreme abuse he endured, Light suffers from depression, relives memories from the past, has non-epileptic seizures, and has severe post-traumatic stress disorder.  In May 2019, he was admitted to another behavioral health facility for profound depression and risk of suicide.

Defendants David Clifton (Clifton) and Does 9-11 were responsible for oversight and supervision of the children within Tulsa County, where Light resided. They had knowledge of complaints made by Light that he was being subjected to abuse and was in danger.  Clifton was the Deputy Director for Region Five and was responsible for supervising the caseworkers assigned to cases, including Light's case.  Does 9-11 were DHS employees in the Tulsa County office who were involved in Light's case.

III.

*Analysis*

Section 1983 Claims

Based upon the factual allegations recounted from the complaint, plaintiffs allege the 14 current and former officers and employees of DHS (named individual defendants) and Does 1-11 violated their Fourteenth Amendment rights to substantive due process.  Plaintiffs also allege a "Monell"[2] liability § 1983 claim against DHS, claiming that the state agency failed to adequately train its employees with respect to the consequences, requirements, and effect of failing to follow the

_____

[2] Monell v. Dept. of Soc. Svcs., 436 U.S. 658 (1978).

law and DHS's policies, procedures, and standards.  Plaintiffs request declaratory, injunctive, and compensatory relief against defendants.

a.      DHS and Named Individual Defendants Sued in Official Capacities

Defendants DHS and the named individual defendants sued in their official capacities seek to dismiss plaintiffs' § 1983 claims on the ground they are not "persons" under § 1983.[3]  The court agrees.  In Will v. Michigan Department of State Police, 491 U.S. 58 (1989), the Supreme Court held that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983."  Id. at 71.  DHS is an arm of the State of Oklahoma, and a suit against DHS is a suit against the state.  See, Washington v. Oklahoma State Department of Human Services, 802 Fed. Appx. 419, 420 (Mem.) (10th Cir. 2020) (unpublished decision cited as persuasive pursuant to 10th Cir. R. 32.1(A)).  Additionally, a suit against the named individual defendants sued in their official capacities for monetary relief is a suit against DHS.  Will, 491 U.S. at 71.  Because the Supreme Court's precedent in Will mandates that neither DHS nor the named individual defendants sued in their official capacities qualify as "persons" under § 1983, the court concludes that plaintiffs' § 1983 claims seeking monetary relief against these defendants are subject to dismissal.  See, Ruiz v. McDonnell, 299 F.3d 1173, 1182 (10th Cir. 2002) (affirming dismissal of § 1983

---

[3] Section 1983 provides that "Every person, who, under color of any statute, ordinance, regulation, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."  42 U.S.C. § 1983; see also, McLaughlin v. Bd. of Trustees, 215 F.3d 1168, 1172 (10th Cir. 2000) ("A cause of action under section 1983 requires the deprivation of a civil right by a 'person' acting under color of law.").

claims against Colorado Department of Human Services (CDHS) and CDHS director acting in her official capacity).[4]

The court notes that in the complaint, plaintiffs, in addition to seeking monetary relief, seek declaratory and injunctive relief.  In <u>Will</u>, the Supreme Court recognized that "a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because official-capacity actions for prospective relief are not treated as actions against the State."  <u>Will</u>, 491 U.S. at 71, n. 10 (internal quotation marks and citation omitted).[5]  However, upon review of the factual allegations in the complaint, the court concludes that the declaratory and injunctive relief sought by plaintiffs is not prospective.  Indeed, none of the minor children or Light are currently in DHS custody.  The court thus concludes that plaintiffs cannot maintain their § 1983 claims for declaratory and injunctive relief against the named individual defendants in their official capacities.  Consequently, all § 1983 claims against DHS and the named individual defendants sued in their official capacities for declaratory, injunctive, and monetary relief are subject to dismissal with prejudice under Rule 12(b)(6), Fed. R. Civ. P., for failure to state a claim upon which relief may be granted.

b.    <u>Named Individual Defendants Sued in Individual Capacities</u>

In their motion, the named individual defendants sued in their individual capacities for monetary relief[6] raise the defense of qualified immunity.   This

---

[4] Plaintiffs' reference to <u>Monell</u> does not save their § 1983 claims against DHS and named individual defendants sued in official capacities.  <u>Monell</u> held that a municipality was a person under § 1983.  However, in <u>Will</u> the Supreme Court reaffirmed what it had concluded, prior to <u>Monell,</u> that a State is not a person within the meaning of § 1983.  <u>Will</u>, 491 U.S. at 64.

[5] Pursuant to <u>Will</u>, DHS is not a person under § 1983 for declaratory and injunctive relief.

[6] The complaint requests declaratory and injunctive relief against all defendants.  It appears that the declaratory relief sought is for purposes of the injunctive relief.  However, "[s]ection 1983

assertion gives rise to a presumption that the named individual defendants are immune from suit. *See*, Matthews v. Bergdorf, 889 F.3d 1136, 1144 (10th Cir. 2018). Consequently, the burden shifts to plaintiffs "to demonstrate the [complaint's] factual allegations establish[] their right to recover against *each* [individual officer or employee]." *Id*. (emphasis in original). If plaintiffs fail to establish either prong of the qualified immunity analysis as to any individual officer or employee, that officer or employee is entitled to prevail on his or her defense. *Id*.

To overcome the qualified immunity defense, plaintiffs "'must establish that each defendant . . . [violated] plaintiffs' clearly established constitutional rights . . . *Plaintiffs must do more than show . . . that "defendants," as a collective and undifferentiated whole, were responsible for those violations*.'" Matthews, 889 F.3d at 1145 (quoting Pahls v. Thomas, 718 F.3d 1210, 1228 (10th Cir. 2013) (emphasis in original).

Plaintiffs' § 1983 claims against the named individual defendants sued in their individual capacities are based on the substantive component of the Fourteenth Amendment's Due Process Clause, which provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "State actors like the [DHS] employees, however, are generally not liable for 'failure to protect an individual against private violence.'" Hunt v. Montano, 39 F.4th 1270, 1278 (10th Cir. 2022) (quoting DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 197 (1989)). One exception to this principle, upon which plaintiffs rely, is the existence of a special relationship between the State of Oklahoma and victim. Matthews, 889 F.3d at 1143.

---

plaintiffs may sue individual-capacity defendants only for money damages and official-capacity defendants only for injunctive relief." Brown v. Montoya, 662 F.3d 1152, 1161 n. 5 (10th Cir. 2011). Thus, the court construes plaintiffs' § 1983 claims as seeking monetary relief against the named individual defendants sued in their individual capacities.

To state a Fourteenth Amendment substantive due process claim based on the special relationship exception, plaintiffs must first allege facts to show a special relationship between the State of Oklahoma and victim.  Second, plaintiffs must allege facts showing that the responsible state actor knew the victim was in danger or failed to exercise professional judgment regarding that danger.  Third, plaintiffs must set forth facts establishing that the state actor's conduct caused the victim's injuries.  Fourth, plaintiffs must plead facts tending to shock the conscience.  *See*, Matthews, 889 F.3d at 1143-1144.

*Special Relationship*

"The existence of the special relationship is the pivotal issue: if none exists, a state cannot be held liable for a person's injuries the hands of a private third party as opposed to a state actor."  Dahn, 867 F.3d at 1186.  "'A special relationship exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual.'" Hunt, 39 F.4th at 1279 (quoting Uhlrig v. Harder, 64 F.3d 567, 572 (10th Cir. 1995)).  Under Tenth Circuit precedent, foster care creates a special relationship.  *Id*.

Plaintiffs allege facts adequate to show a special relationship between the State of Oklahoma and the Hughes-Hawkins' minor children, D.H. S.H., Sk.H., and I.H., and a special relationship between the State of Oklahoma and Searcy's minor children, DARS, DJA, BLS and MWDS.  At all times relevant to plaintiffs' allegations, the minor children were in DHS's foster care program.

As to Light, plaintiffs allege facts adequate to show a special relationship between the State of Oklahoma and Light during his foster-to-adopt placement— starting in 2010 and ending in 2013 and starting in June 2017 and ending sometime after January 2018.  However, during the time Light was returned to his biological mother by DHS and during the time Light was adopted by his foster parents, plaintiffs do not allege facts adequate to show a special relationship.  *See*, Matthews,

889 F.3d at 1146 ("But a child alleged to be adopted, living with an adult pursuant to a guardianship, or 'just living' with an adult is not in the custody of the State and, unlike a foster child, does not have a special relationship with the State.").

Plaintiffs do not allege facts adequate to show a special relationship between the State of Oklahoma and Caplan.  The minor child was not in the foster care program.  She was living with her biological mother at all relevant times.  "The state has a special relationship with only individuals dependent completely on the state to satisfy their basic human needs."  <u>Matthews</u>, 889 F.3d at 1146, *see also*, <u>DeShaney</u>, 489 U.S at 200 ("The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help [her], but from the limitation which it has imposed on [her] freedom to act on [her] own behalf.").  In the absence of the existence of a special relationship, the named individual defendants sued in their individual capacities cannot be held liable under the special relationship exception for the injuries Caplan suffered at the hands of Sowards.  *See*, <u>Matthews</u>, 889 F.3d at 1143, 1145.  Consequently, plaintiffs' § 1983 claims with respect to Caplan are subject to dismissal without prejudice based on qualified immunity.

*Knowledge/Failure to Exercise Professional Judgment and Causation*

1.  <u>Defendants Brown and Shropshire</u>

Plaintiffs fail to allege facts sufficiently to satisfy the second and third elements of the special relationship exception as to defendants Justin Brown (Brown) and Dr. Deborah Shropshire (Shropshire).  The "special relationship triggers a continuing duty" that "is subsequently violated if a state official 'knew of the asserted danger to [a foster child] or failed to exercise professional judgment with respect thereto, . . . and if an affirmative link to the injuries [the child] suffered can be shown." <u>Schwartz v. Booker</u>, 702 F.3d 573, 580 (10th Cir. 2012).  The alleged injuries suffered by the Hughes-Hawkins' minor children occurred on or before June

23, 2018.  The injuries suffered by Searcy's minor children occurred between on or about December 11, 2017 and December 11, 2018.  The alleged injuries of Light, while in a special relationship with the State of Oklahoma, occurred sometime in 2013.  However, according to the complaint, defendant Brown became the Director of DHS in or around June 2019, and defendant Shropshire became the Director of the Child Welfare Services Division of DHS in or around June 2019.  There are no allegations that either of these defendants served in any other position with DHS prior to June 2019.  Consequently, the court concludes that plaintiffs fail to plead facts sufficient to establish the second (knowledge of asserted danger or failure to exercise professional judgment with respect to that danger) and third (causation) elements of the special relationship exception as to defendants Brown and Shropshire.

2.  <u>Defendant Lake</u>

As to defendant Ed Lake (Lake), plaintiffs also fail to allege facts sufficient to show the second and third elements of the special relationship exception.  Lake is the former Director of DHS.  According to the complaint, Lake was responsible for running DHS and implementing and enforcing policy, including with respect to employee caseloads, foster care, child safety and quality assurance.  Although Lake served in that role during the times relevant to plaintiffs' § 1983 claims, the factual allegations as to Lake do not in any way specifically connect him with any of the minor children or Light.  Lake did not supervise or have oversight over the minor children or Light.  The complaint alleges that Lake had "actual and constructive knowledge of the failures of the foster homes, shelters, and care providers to adequately and appropriately protect children" and that "DHS workers advised Lake and others at DHS of the problems in the DHS system and the failure to protect children."  Doc. no. 21, ¶¶ 211-212.  It also alleges that Lake was specifically advised by Shawna Burley, a child welfare worker, "about the high burden being

placed on DHS workers and the the refusal and failure of the workers to be able to adequately investigate claims."   There is no identification of individuals.   This allegation refers only "DHS workers" and to "the workers."   *Id*. at ¶ 213. Additionally, it alleges certain DHS employees went to the media during late 2017 and early 2018 about the failure to investigate and failure to follow DHS policy and procedure.  *Id*. at ¶¶ 218-220.  These allegations, however, do not show that Lake had actual or constructive knowledge of the alleged abuse of any of the minor children or Light.

The complaint also fails to allege facts sufficient to show that Lake failed to exercise professional judgment with respect to the asserted danger to the minor children or Light.   A state official's failure to exercise professional judgment requires more than mere negligence; it requires an abdication of professional responsibility.  *See*, J.W. v. Utah, 647 F.3d 1006, 1011 (10th Cir. 2011).  Plaintiffs fail to allege facts sufficient to plausibly show that Lake abdicated any of his professional responsibilities with respect to the asserted danger to the minor children or Light.  Furthermore, plaintiffs fail to allege facts sufficient to support a plausible inference that Lake's conduct caused the alleged injuries of the minor children or Light.

3. Defendants Ledoux, Powell, Howell and Majors

Plaintiffs also fail to plead facts sufficient to show the second and third elements of the special relationship exception as to defendants Jami Ledoux (Ledoux), Sheree Powell (Powell), Tricia Howell (Howell) and Jamie Majors (Majors).  With respect to these defendants, the complaint only alleges the positions they held and their duties in those positions.  *See*, doc. no. 21 (Ledoux, ¶¶ 31-32; Powell, ¶¶ 33-36; Howell, ¶¶ 42-44; Majors, ¶ 45).  The factual allegations, however, do not tie any conduct by these defendants to any of the minor children or Light. The fact that the complaint refers to the actions, inactions, or knowledge of

"individual Defendants," "Defendants," "DHS employees" or "DHS workers" is not sufficient to show the second and third elements of the special relationship exception as to defendants Ledoux, Powell, Howell, and Majors.  *See*, Pahls, 718 F.3d at 1225 ("The Complaint refers to actions of 'Defendants,' but that is not sufficient to show how Secretary Williams 'might be individually liable for deprivations of [Mr. Brown's] constitutional rights.'") (quoting Brown v. Montoya, 662 F.3d 1152, 1165 (10th Cir. 2011)) (other quotation omitted).[7]

4.   Defendants Kelly, Gissandaner and Mosier

The complaint's factual allegations are likewise inadequate to establish the second and third elements of the special relationship exception as to defendants Kelly, Gissandaner, and Mosier.  Although plaintiffs allege that these defendants were responsible for oversight and supervision of the children within Oklahoma County and Region Three, including the Hughes-Hawkins' minor children, D.H., S.H., Sk.H. and I.H., they do not plead facts sufficient to plausibly support an inference that the defendants knew of the alleged abuse of the minor children. According to the complaint, Hughes, Hawkins, and the Cheyenne Arapaho Indian Child Welfare Workers complained to "DHS" about the minor children's injuries and abuse, repeatedly requested "DHS" remove the minor children from Kersey's care because they were not safe and cared for by Kersey, and that "DHS" was on actual and constructive notice of Kersey's refusal to give Cheyenne Arapaho Indian Child Welfare Workers access to the minor children when they appeared for unannounced visits to check on their welfare.  *See*, doc. no. 21, ¶¶ 94 and 97.  The

---

[7] Additionally, with respect to Ledoux, the court notes that the complaint alleges that she was the Interim Director of the Child Welfare Division from in or around August 2014 until in or around August 2015 and that she was Director of the Child Welfare Division from in or around August 2015 until May 2018.  However, there are no factual allegations that Ledoux was employed with DHS during the time that Light was injured in 2013 or on June 23, 2018, when D.H. was injured.

pleading further alleges that "DHS" chose and refused to perform mandatory duties, including adequate investigation, upon actual notice of the alleged abuse and injuries suffered by the minor children.  *Id*. at ¶ 98.  However, the "DHS" reference by plaintiffs is insufficient to suggest that defendants Kelly, Gissandaner, and Mosier were aware of any alleged abuse to the minor children by Kersey. *See*, Kansas Penn Gaming, LLC, 656 F.3d at 1215.

With respect to defendants Kelly and Gissandaner, plaintiffs allege that in April and May of 2017, Heidi Stingley, a DHS supervisor in Oklahoma County, informed these defendants "about the failures in the child welfare system and its contributions to the child deaths and neglect of the children while under the care and custody of the system."  Doc. no. 21, ¶ 216.  This allegation, however, does not plausibly suggest that defendants Kelly and Gissandaner were aware of the asserted danger to the Hughes-Hawkins' minor children.

Plaintiffs also fail to plead facts to plausibly support an inference that defendants Kelly, Gissandaner, and Mosier abdicated any of their professional responsibilities to the minor children.  Plaintiffs' references to actions or inactions of "individual defendants," "Defendants," "DHS employees" or "DHS workers" are not sufficient to show actions or inactions of defendants Kelly, Gissandaner, and Mosier.  *See*, Matthews, 889 F.3d at 1145.

Further, plaintiffs' factual allegations are not sufficient to plausibly support an inference that the conduct of defendants Kelly, Gissandaner, and Mosier caused the injuries to the Hughes-Hawkins' minor children.

5. Defendants Whitson, Poplin and Parkhurst

As to defendants Whitson, Poplin and Parkhurst, plaintiffs also fail to plead facts sufficient to establish the second and third elements of the special relationship exception.  The complaint alleges that defendants Whitson, who was Region One Deputy Director, Poplin, who was a Child Welfare Supervisor, and Parkhurst, who

was a supervisor in DHS's Canadian County office, were responsible for oversight and supervision of children within Canadian County, including Searcy's minor children.  The pleading, however, fails to sufficiently plead facts to plausibly support an inference that these defendants knew of the asserted danger (alleged physical, emotional and sexual abuse) to Searcy's minor children or abdicated any professional responsibility with respect to the asserted danger.  According to the complaint, "Defendants collectively" received multiple complaints about the "treatment of the Searcy children" while in custody.  Doc. no. 21, ¶ 162.  "The DHS worker individual Defendants each" actively refused and failed to investigate the claims "as they were brought to the agency's attention by Searcy and/or her family." *Id*. at ¶ 164.  Further, "[t]he DHS workers" to whom the abuse and neglect were reported "chose and refused to take reasonable and appropriate action to investigate the allegations and refused and failed to protect the children[.]" *Id*. at 165.[8]  The court cannot discern which defendant or DHS worker the plaintiffs refer to here.  The allegations are not sufficient to plausibly support an inference that defendants Whitson, Poplin, and Parkhurst were aware of the alleged abuse suffered by Searcy's minor children or abdicated any professional responsibility while the children were in DHS custody.

---

[8] The court notes that the complaint alleges that Searcy's children were in DHS custody from December 11, 2017 until March 15, 2019.  Although in DHS custody until March 15, 2019, BLS was returned to the custody and care of Searcy in October 2018, and the other children were returned to her custody and care on December 11, 2018.  Plaintiffs allege that "[w]hile DARS, DJA, BLS, and MWDS were in the care, custody, and control of DHS, they feared disclosing to their mother the full nature and extent of the neglect and abuse they were experiencing."  Doc. no. 21, ¶ 144.  They also allege that "[d]ue to the ongoing court case and statements made by DHS workers, contractors, and the Court, Searcy feared making any official report or claim on behalf of herself and [the minor children]."  Doc. no. 21, ¶ 145.

The complaint additionally fails to plead facts sufficient to show that the minor children's injuries were caused by the conduct of defendants, Whitson, Poplin, and Parkhurst.

With respect to Parkhurst, the complaint further alleges that after Searcy's minor children were taken into custody, Parkhurst "actively sought to prevent the children from being returned to Searcy." Doc. no. 21, ¶ 137. It also alleges that Parkhurst supported and backed the JD McCarty Center employee who falsely testified that Searcy was not compliant with the plan of treatment and care for BLS, because she maintained "Searcy was not a safe proper parent." *Id*. at ¶ 149. It appears from these allegations that plaintiffs may allege a Fourteenth Amendment substantive due process claim for interference with the right to familial association. *See*, Halley v. Huckaby, 902 F.3d 1136, 1154 (10th Cir. 2018). To succeed on that claim, plaintiffs must plausibly allege that (1) defendant intended to deprive plaintiffs of a protected relationship; and (2) plaintiffs' interest in the protected relationship outweighs the state's interest in an unwarranted intrusion into that relationship. *Id*. at 1153. And the "ultimate inquiry is whether [] defendant's conduct shocks the judicial conscience." *Id*. at 1156. Upon review, the court concludes that the complaint's factual allegations are insufficient to establish that Parkhurst intended to deprive Searcy or her minor children of the familial relationship. And the allegations as to this incident are insufficient, in the court's view, to shock the conscience. Thus, the court concludes that the complaint fails to plausibly allege a Fourteenth Amendment substantive due process claim for interference with the right to familial association against Parkhurst.

6. Defendant Clifton

As to defendant Clifton, plaintiffs' factual allegations are insufficient to establish the second and third elements of the special relationship exception. According to the complaint, Clifton was the Region Five Deputy Director and was

responsible for supervising caseworkers assigned to cases in that region, including those responsible for Light's case. Although the complaint alleges that Clifton "had knowledge of complaints made by Light that he was being subjected to abuse and was in danger," doc. no. 21, ¶ 202, it does not allege facts sufficient to show that the complaints Clifton purportedly had knowledge of were of the "instances of abuse by his foster parents" in 2013. *Id.* at ¶ 193. As previously discussed, the factual allegations only indicate the existence of a special relationship between the State of Oklahoma and Light starting in 2010 and ending in 2013 and then starting again in June 2017 and ending sometime after January 2018. While the complaint describes various instances of abuse endured by Light during his childhood, the only alleged abuse during the time when Light was in DHS custody occurred in 2013. And according to plaintiffs' factual allegations, those instances of abuse were reported to "DHS workers." *Id.* The court cannot conclude that the "DHS workers" includes Clifton. In the court's view, the complaint does not adequately allege facts sufficient to plausibly support an inference that Clifton had knowledge of the asserted danger posed to Light by his foster parents in 2013.

In addition, the complaint fails to allege facts sufficient to plausibly support an inference that Clifton abdicated any professional responsibility with respect to the asserted danger. Further, the pleading fails to plead facts to plausibly support an inference that Light's injuries were caused by any alleged conduct of Clifton.

*Shocks the Conscience*

To mount a successful substantive due process claim based on the special relationship exception, "a plaintiff must separately demonstrate the conscience-shocking nature of a defendant's conduct." Gutteridge v. Oklahoma, 878 F.3d 1233, 1241 (10th Cir. 2018). In this regard, a plaintiff must allege facts to establish "a government actor arbitrarily abused his authority or employ[ed] it as an instrument of oppression. The behavior complained of must be egregious and outrageous."

Hernandez v. Ridley, 734 F.3d 1254, 1261 (10th Cir. 2013) (alteration in original) (quotations marks and citation omitted); *see also*, Uhlrig, 64 F.3d at 574 ("[T]he plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking."). The court looks to the alleged "conduct as a whole to determine whether it 'shocks the conscience.'" Uhlrig, 64 F.3d at 576.

The court concludes that the complaint fails to plead facts sufficient to plausibly support an inference that defendants Brown, Shropshire, Lake, Ledoux, Powell, Howell, Majors, Kelly, Gissandaner, Mosier, Whitson, Poplin, Parkhurst, and Clifton, engaged in conduct that was so egregious and outrageous so as to shock the conscience. Consequently, plaintiffs cannot establish the fourth element of the special relationship exception as to the named individual defendants.

* * *

In sum, the court concludes that plaintiffs have failed to plausibly allege a Fourteenth Amendment substantive due process claim based upon the special relationship exception against defendants Brown, Shropshire, Lake, Ledoux, Powell, Howell, Majors, Kelly, Gissandaner, Mosier, Whitson, Poplin, Parkhurst, and Clifton. As result, the court finds that plaintiffs' § 1983 claims against the named individual defendants are subject to dismissal without prejudice based on qualified immunity.

Further, because plaintiffs have failed to allege the existence of a special relationship between the State of Oklahoma and Caplan, plaintiffs' § 1983 claims against the named individual defendants relating to Caplan are also subject to dismissal without prejudice based upon qualified immunity.

7. Supervisory Liability Claims

"A § 1983 defendant sued in an individual capacity may be subject to personal liability and/or supervisory liability." Brown v. Montoya, 662 F.3d 1152, 1163 (10th

Cir. 2011).  "Supervisory liability 'allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, [or] implements . . . a policy . . . which subjects, or causes to be subjected that plaintiff to deprivation of any rights . . . secured by the Constitution.'"  *Id*. at 1163-1164 (quoting Dodds v. Richardson, 614 F.3d 1185, 1199 (10th Cir. 2010)).  "[T]o establish supervisory liability, a plaintiff must show that '(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.'"  *Id*. at 1164 (quoting Dodds, 614 F.3d at 1199).

It is not clear from the complaint's factual allegations whether plaintiffs seek to hold the named individual defendants liable based upon supervisory liability. However, to the extent they are, the court concludes that the factual allegations are not adequate to establish supervisory liability.  The court therefore concludes that any § 1983 claims against the named individual defendants based upon supervisory liability are subject to dismissal without prejudice based upon qualified immunity.

8. Discovery

In their response, plaintiffs request that "[i]f the Court is inclined to dismiss any of the Individual Defendants," the court issue an order pursuant to 10A O.S. § 1-6-102[9] to permit plaintiffs' counsel access to the minor children and Light's "*own* confidential records" and allow plaintiffs' counsel to amend the complaint. Doc. no. 28, ECF p. 20 (emphasis in original).

---

[9] Section 1-6-102 provides that juvenile court records, agency records, district attorney's records, court appointed special advocate records pertaining to a child welfare case, law enforcement records, nondirectory education records, and social records are confidential and shall be inspected, released, disclosed, corrected, or expunged only pursuant to an order of the court. 10A O.S. § 1-6-102(C).

The complaint alleges some heart-rending facts. The court cannot but wonder–seriously–whether the confidential files contain information as to some individual defendants sufficient to enable at least some of the plaintiffs to proceed. However, in the qualified immunity context, the Supreme Court has imposed an all-but-ironclad rule that a § 1983 plaintiff must plead himself into court and get past qualified immunity (if, as here, challenged at the Rule 12(b)(6) stage) without the benefit of formal discovery. Ashcroft v. Iqbal, 556 U.S. 662, 685-686 (2009). *See also*, Goodnight v. Lester, 2012 WL 6084514, *5 (W.D. Okla. Dec. 6, 2012). In the court's view, a good case could be made, on these alleged facts, that plaintiff should at least be permitted to see what the confidential files have to say. After all, those files would seem likely, by their nature, to be repositories of reasonably reliable information about who knew what and when and who did (or didn't) do what, and when. However, acknowledging the strength of the Supreme Court's mandate in cases like Iqbal, the court denies plaintiffs' request, albeit with regret.[10]

9. Does 1-11

The complaint alleges Fourteenth Amendment substantive due process claims under § 1983 against defendants "John and/or Jane Does 1-11." Does 1-11 are sued both in their official and individual capacities. To the extent Does 1-11 are sued in their official capacities, the court concludes that they are not "persons" under § 1983, and the § 1983 claims are subject to dismissal with prejudice for failure to state a

---

[10] Rule 7 of the Federal Rules of Civil Procedure mandates that "[a] request for a court order must be made by motion." Rule 7(b), Fed. R. Civ. P. Plaintiffs have not filed a motion; rather they have made their request for a court order in the response to defendants' dismissal motion. Rule 7.1 of the court's Local Civil Rules provides that "[a] response to a motion may not also include a motion . . . by the responding party." LCvR7.1(c). Because plaintiffs have neither complied with the Federal Rules of Civil Procedure or the court's Local Civil Rules, the court could conceivably deny plaintiffs' request on that basis. As a matter of exercise of the court's discretion on the facts of this case, the court would not be inclined to deny plaintiffs' request on that basis.

claim upon which relief may be granted.  As to the individual-capacity § 1983 claims, the court concludes that plaintiffs have failed to state plausible Fourteenth Amendment substantive due process claims based on the special relationship exception against Does 1-11 for the same reasons previously discussed with respect to the named individual defendants.  Therefore, the court concludes that the § 1983 claims against defendants "John and/or Jane Does 1-11" should be dismissed without prejudice under Rule 12(b)(6), Fed. R. Civ. P., for failure to state a claim upon which relief can be granted.[11]

State Law Claims

Plaintiffs, in addition to their federal claims under § 1983, allege state law claims, including violation of the Oklahoma constitution,[12] negligence, negligence *per se*, intentional infliction of emotional distress and civil conspiracy.  They rely on the federal supplemental jurisdiction statute, 28 U.S.C. § 1367, as the jurisdictional basis for their state law claims.

---

[11] The court notes that Does 1-11 have not been served within the 90-day period specified by Rule 4(m), Fed. R. Civ. P.  The court also notes the statute of limitations applicable to § 1983 claims is the two-year statute of limitations set forth in 12 O.S. § 95(3).  *See*, Meade v. Grubbs, 841 F.2d 1512, 1523 (10th Cir. 1988), *abrogated in part on other grounds by* Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009).  Further, the court notes that any substitution by plaintiffs of named defendants for Does 1-11 in a later amendment would amount to adding new parties.  *See*, Garrett v. Fleming, 362 F.3d 692, 696 (10th Cir. 2004).  An amendment that adds a new party relates back to the original complaint only when the party to be brought in by amendment "[1] received such notice of the action that [he or she] will not be prejudiced in defending on the merits; and [2] knew or should have known that the action would have been brought against [him or her], but for a mistake concerning the proper party's identity."  Rule 15(c)(1)(C)(i)-(ii), Fed. R. Civ. P. The Tenth Circuit has specifically held that "a plaintiff's lack of knowledge of the intended defendant's identity is not a 'mistake concerning the identity of the proper party' within the meaning of [Rule 15(c)(1)(C)]."  Garrett, 362 F.3d at 696.  In other words, a "plaintiff's designation of an unknown defendant . . . in the original complaint is not a formal defect of the type [the rule] was meant to address," and a later amendment that specifically names that defendant does "not relate back to the date of [the] original complaint." *Id.* at 697.

[12] Plaintiffs' complaint entitles the third cause of action as "Respondeat Superior (Against Defendant DHS)."  According to plaintiffs, the third cause of action is "clearly alleged on Oklahoma Constitutional grounds."  Doc. no. 27, ECF p. 18.

The Tenth Circuit has instructed that "[w]hen all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state law claims." Koch v. City of Del City, 660 F.3d 1228, 1248 (10th Cir. 2011) (citation omitted). Because plaintiffs' action was removed from state court by defendants, the court "has discretion to remand the case to state court" rather than to dismiss it without prejudice. *See*, Carnegie-Mellon University v. Cohill, 484 U.S. 343, 351 (1988). Given the early stages of the case and the dismissal by plaintiffs of previously filed lawsuits against defendants, the court will exercise its discretion and decline to exercise supplemental jurisdiction over the state law claims and remand the action to state court. In light of the court's remand to state court, the court will strike as moot defendants' motions relating to dismissal of the state law claims. Defendants may raise those issues before the state court.

IV.

*Conclusion*

For the reasons stated, the court **ORDERS** as follows:

Plaintiffs' Motion Requesting Oral Argument on Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint (doc. no. 31) is **DENIED**.

The Motion to Dismiss Plaintiffs' Second Amended Complaint (doc. no. 25) filed by the named individual defendants (Brown, Lake, Shropshire, Ledoux, Mosier, Gissandaner, Powell, Kelly, Majors, Poplin, Whitson, Clifton, Parkhurst, and Howell) and the Motion to Dismiss Plaintiffs' Second Amended Complaint of Defendant State of Oklahoma ex rel. Department of Human Services (doc. no. 26) are **GRANTED in part** and **STRICKEN as MOOT in part**.

Plaintiffs' § 1983 claims against defendant DHS and the named individual defendants (Brown, Lake, Shropshire, Ledoux, Mosier, Gissandaner, Powell, Kelly, Majors, Poplin, Whitson, Clifton, Parkhurst, and Howell) sued in their official

capacities are **DISMISSED** with prejudice under Rule 12(b)(6), Fed. R. Civ. P., for failure to state a claim upon which relief can be granted.

Plaintiffs' § 1983 against the named individual defendants (Brown, Lake, Shropshire, Ledoux, Mosier, Gissandaner, Powell, Kelly, Majors, Poplin, Whitson, Clifton, Parkhurst, and Howell) sued in their individual capacities are **DISMISSED** without prejudice under Rule 12(b)(6), Fed. R. Civ. P., based upon qualified immunity.

Plaintiffs' § 1983 claims against defendants "John and/or Jane Does 1-11" are **DISMISSED** with prejudice under 12(b)(6), Fed. R. Civ. P., for failure to state a claim upon which relief can be granted, to the extent defendants are sued in their official capacities, and **DISMISSED** without prejudice under Rule 12(b)(6), Fed. R. Civ. P., for failure to state a claim upon which relief can be granted, to the extent defendants are sued in their individual capacities.

With the dismissal under Rule 12(b)(6), Fed. R. Civ. P., of all plaintiffs' federal law claims, the court **REMANDS** this action to the District Court of Oklahoma County, State of Oklahoma, for further proceedings with respect to plaintiffs' state law claims.

DATED this 31st day of August, 2022.

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

21-1094p009 (REV)_.docx